White v. Brownell.

New trial ordered.

CUMBERLAND G. WHITE v. JOHN L. BROWNELL, PRESIDENT, &c., *and others.*

As the privilege of membership of a voluntary unincorporated association is not conferred by the sovereign power, but is created solely by the organization itself, courts of law cannot compel the admission of an applicant for membership, nor interfere to restore to membership one who has been expelled for noncompliance with the conditions upon which membership is made to depend.

The members of such an association are bound by its rules, when not in conflict with the law of the land; and the courts can interfere no further than to hold the association to a fair and honest administration of those rules. Therefore, to warrant the granting of an injunction to restrain the officers of a voluntary unincorporated association from carrying into effect a resolution or vote suspending a member from the privileges of the association, it must appear that the suspension was in violation of the constitution, rules, or by-laws; for, unless they were violated by the proceedings against him, he could have no ground of complaint.

The "Open Board of Brokers," in the city of New York, is not a copartnership within the operation of the equitable remedies afforded by the courts for the protection of the rights of partners, as between themselves.

Nor is that board a corporation in such sense as to render it subject to the rules by which courts of equity interfere to restore a corporator, who has been unlawfully expelled or disfranchised, to his privileges of membership.

APPEAL by the plaintiff from an order granting a motion to vacate an injunction.

The action was brought against the defendants, Brownell, president of the "Open Board of Brokers," and others, to obtain an injunction restraining them from interfering with the plaintiff's privileges as a member of that board.

The Open Board of Brokers was organized in the year 1864, by S. L. Joseph, Samuel B. Hard, and seventy-five other persons, their associates. The associates adopted a constitution and by-laws, and made provision therein for a room for the use of the board, for the election of a president and other officers, for the formation of an executive committee, a committee of membership, a committee of arbitration and a board of appeals. It also provided for the election of new members. Elections to membership were to be made by ballot, and after the report of the committee on membership, whose duty it was to make diligent inquiry as to the qualifications of the applicant; the new member, upon signing the constitution and paying an initiation fee, was entitled to all the rights and privileges of a member. No person is declared to be eligible to membership unless he procures a Government license as a broker. The constitution also contains clauses for the suspension and expulsion of members, and their readmission. It also provides that every member pledges himself to abide by the constitution, by-laws, and rules of the association. Under the provisions of the constitution, several hundred new members have been admitted to the board, with all the rights and privileges of the original subscribers.

It is declared to be the duty of the arbitration committee to take cognizance of and exercise jurisdiction on all claims and all matters of difference between members of the board, and its decision is declared to be binding. It is provided, however, that an appeal from the judgment of the arbitration committee may be taken to the board of appeals, which board shall take cognizance of all cases of appeal from the judgment of the arbitration committee.

It is also provided in the by-laws, that, "as a means of mutual protection," it shall be the duty of any member to report to the board all cases of defalcation of contracts of other members, and all cases of refusal or inability to pay differences,

whereupon the president shall declare the member so reported suspended. From such suspension the reported member may appeal, and demand a hearing before the executive committee.

' In the year 1865, the plaintiff, who was a stock broker, doing business in New York, was elected a member of the board. He paid his fee on initiation, and subscribed the constitution, and became entitled to all the privileges, and was subject to all the obligations of membership under the constitution and by-laws.

In May, 1867, the by-laws were so amended as to provide that whenever a ·member be in default in any contract, and the fact should become known to the committee on membership, the committee, after due investigation, should report the same without delay, through their chairman, to ' the president of the board, who should at once declare the member so reported suspended from all the privileges and immunities of the organization ; that from such suspension the reported member might appeal within sixty days from the date of such suspension, and demand a hearing before the executive committee, who should give public notice at the board at least five days before such appeal, for the purpose of enabling any person interested to present objections, and that they should report the result of their investigation.

If it should appear that the complaint is just, the declaration of suspension should be confirmed, otherwise it should be annulled.

It appears that the association are the lessees, and are in the occupation of a building known as number 18 Broad street, where the business of the association is transacted, and are the owners of a considerable amount of Government bonds and ' other assets, the ' accumulation of initiation fees of members and fines imposed. The sittings of the associates are held in the building on Broad street, at stated hours of the day, in a large room, which partakes of the character of an exchange or mart where gold, stocks, and other securities are bought and sold by the members dealing with each other, and that the right to enter such room, and to take part in the sessions of the board, and to have free access to the same, and to transact

business thereat, in the purchase and sale of stocks and other securities, as a broker and as an associate, forms the principal right and privilege of a member of the board.

In the month of January, 1867, the plaintiff entered into a contract with Currie, Martin & Co., stock brokers and associates with plaintiff as members of the board, by which Currie, Martin & Co. purchased of the plaintiff one thousand shares of the capital stock of the Hudson River Railroad Company, at 128 per cent., payable and deliverable at seller's option, this year, 1867, with interest at the rate of six per cent. per annum, either party having the right to call from time to time for deposits to meet the fluctuations of the market. Deposits were made by both parties to the contract in the United States Trust Company, from time to time, under the contract, to the amount of $55,000 each.

The Hudson River Railroad Company having adopted a resolution in April, 1867, increasing the capital stock of the company, permitted stockholders to subscribe for such new stock within a certain time, and upon certain conditions. On the 10th April, Currie, Martin & Co. notified plaintiff that they elected to subscribe for the additional stock in the company, and that they looked to plaintiff for same. The plaintiff avers that he had no right to subscribe for the new stock; that he was not a stockholder, and that he would not have subscribed for such additional stock were he a stockholder, as he did not consider the stock to be a good and profitable investment.

On the 5th September, 1867, Currie, Martin & Co. called on the plaintiff to deposit $10,000 further margin to secure the contract, which plaintiff refused to furnish, whereupon they notified plaintiff that they would, under the rules of the board, purchase at the board 2,000 shares of the stock of the company, whereupon the plaintiff served on the president of the board a protest against the purchase of any shares of stock in the Hudson River Railroad Company upon his account, under his contract with Currie, Martin & Co. The president of the board did, under the rules, purchase the 2,000 shares of stock on plaintiff's account, which was paid for by Currie, Martin &

Co., notice of which was given to plaintiff by Currie, Martin & Co. on the same day; the notice was at once returned by plaintiff, with a notice to Currie, Martin & Co. that he repudiated the transaction.

Currie, Martin & Co. then made a *claim* on the plaintiff for a large sum of money as difference in their favor, and demanded payment thereof, which was refused by plaintiff.

On the 6th day of September, 1867, Currie, Martin & Co. presented their claim and difference to the arbitration committee, and demanded an examination, inquiry and decision upon the same. This committee appointed a meeting for such purpose, for the 9th day of September. The plaintiff was notified to appear on that day before the committee, and interpose whatever defense or objection he might have to the claim and demand of Currie, Martin & Co. On the day the committee met, the claimants appeared before it, and presented their claim, and gave evidence of the facts upon which it was based. The plaintiff did not appear before the committee. He declined, and refused to be present or submit the matter to them, and served upon the chairman of the committee a notice in writing of such refusal.

The committee made their report, finding, in substance, that Currie, Martin & Co. were entitled, under the contract of February 18th, 1867, to one thousand shares of the increased capital stock of the Hudson River Railroad Company, they having given notice to plaintiff that they elected to subscribe for the same; that default having been made by plaintiff in responding to the call for additional deposit, it was at the option of the claimants, under the rules of the board, to elect whether to cancel, to close, or to continue the contract, and that Currie, Martin & Co. did elect to close same. Judgment was rendered in favor of the claimant against plaintiff, in the sum of sixty-nine thousand six hundred and thirty-three dollars and thirty-four cents, with interest.

Plaintiff did not appeal to the board of appeals from the decision of the arbitration committee. After the expiration of the time to appeal, Currie, Martin & Co. caused the facts and circumstances to be brought to the notice of the committee on

membership. A meeting of this committee was held on the 10th of September; the claim and difference was investigated by this committee, and the committee reported to the president of the board that the plaintiff was in default in his contract with Currie, Martin & Co.

On the 19th September, the president of the board declared the plaintiff suspended from all the privileges of the said organization.

The plaintiff took an appeal to the executive committee of the board, from such declaration of suspension, in pursuance of the provisions of the constitution. The president of the board took measures to have said committee called together to consider said appeal, and a meeting of the committee was held on the 25th September, in pursuance of the notice required, at which a quorum was not present, and before another meeting was held this suit was commenced in this court.

After the service of the complaint in this suit, a meeting of the executive committee was held to consider the appeal, of which plaintiff had notice. Plaintiff appeared before the committee, refused to prosecute his appeal, and protested against and forbid the committee from taking any proceeding or action in the appeal, and the committee took no further action.

The plaintiff charged in his complaint that several members of the arbitration committee were prejudiced against him and his claim, and had, before acting, expressed an opinion favorable to Currie, Martin & Co.'s view of the matter; that there was unnecessary delay in assembling a meeting of the executive committee; that the delay was occasioned by a disposition on the part of Currie, Martin & Co., and other members of the association, to deny the plaintiff justice; that the association, through its officers, committees, and members sufficient to control its action, has denied the plaintiff justice. The plaintiff denied all the claims made by Currie, Martin & Co., and claimed that his original contract with them was still in force. He claimed that his suspension was unjust, and would inflict irreparable injury on him in his vocation, as broker, by his exclusion from the rooms of the board, and exclusion from his rights and immunities as a member.

Plaintiff demanded judgment that the board and its offi-
cers and servants might be enjoined and restrained from in any
manner interfering with him in the full and free exercise and
enjoyment of all his rights and franchises as a member of the
organization, or with his enjoyment, in common with other
members of the association, of the right to enter the rooms, and
remain at all the sessions of the board, and to transact business
thereat in the buying and selling of gold, stocks, and other
securities, as other members do, or from treating him other-
wise than as an actual and unsuspended member.

The president of the board, in his answer to the complaint,
denied that either himself or any other officer or member of the
board, so far as he had any knowledge or information, had at
any time taken any side, or combined, or in any manner acted
with or at the instigation of the said firm of Currie, Martin &
Co., against or to the prejudice of the plaintiff, or had in any
way or manner desired or sought to deny the plaintiff justice,
or to interfere in any way or manner, except so far as the
constitution and by-laws of the board required them to inter-
fere in the controversy between plaintiff and Currie, Martin
& Co.

An injunction was obtained by plaintiff on his complaint.
The defendant, the president of the Open Board of Brokers,
moved at special term for a dissolution of the injunction on
the complaint and answer. The motion was granted, and the
injunction dissolved, with the following opinion by

VAN VORST, J.—The Open Board of Brokers is not a cor-
poration; the obligations and rights of its members are not de-
termined or fixed by any statutory enactment general or special.
It is not a joint stock association. There has been no contribu-
tion of capital by its members for the prosecution of business
of any kind by the association. There has been no stock issued
to its members, nor can the individual members claim any rights
of property in it as stockholders.

The association is engaged in no business and does not de-
vote its funds to the prosecution of any undertaking to produce
profit or gain to its members; nor is it a copartnership; in its

organization, the essential features which characterize a partnership are wholly wanting. There are no profits earned to be divided among the members, nor are there losses to be borne.

The constitution, the contract between the parties, does not establish copartnership relations between the members; the associates do not hold themselves out to the world as copartners, nor is there any thing to show that they regard themselves, the one to the other, in that relation.

The association looks to a continued existence, unaffected by the death, resignation, suspension, or removal of its members. If it was a simple copartnership, the death or retirement of an associate would dissolve it.

It is an established principle in the law of partnership, that if it be without any definite period, any partner may withdraw at a moment's notice, when he pleases, and dissolve the partnership, and the civil law contains the same rule (Kent's Com. vol. 3, p. 53).

The death of either party is, *ipso facto*, from the time of the death a dissolution of the partnership, however numerous the association may be.

But in this organization, although individual members retire, die, or are expelled, the body lives.

The status, rights, and obligations of this plaintiff are not, therefore, to be determined by a consideration of this association in the light of its existence either as a corporation, joint stock association, or copartnership.

The Open Board of Brokers is a *voluntary association* of persons, who, for convenience in the transaction of business with each other, have associated themselves to provide a common place for the transaction of their individual business, agreeing among themselves to pay the expenses incident to the support of a "*Mart*," in which each for himself, at stated hours of the day, and for his individual profit, may prosecute his own business and enter into separate engagements with his fellow members. The association does not share in the losses of the individual associates, each member takes his own gains, and individually sustains the losses incident to his engagements. The organization of this board grew out of a necessity for "new

White v. Brownell.

and greater facilities for exchange and negotiation incident to the rapidly developing interests of the country and the increasing number and value of its commercial securities." As the number of these securities had been largely augmented, so, too, the body of persons who dealt in them as purchasers and sellers for others had greatly increased, and new organizations were required to be formed, and new places of business appointed to meet the wants of a growing and increasing business. The persons who formed this association were brokers. It is stated in the constitution that no person was eligible to membership unless he possessed a Government license as a broker. A broker is an agent simply. He transacts business not for himself, but for another. He is a middle man, a negotiator between other persons for a compensation.

A stock broker deals in stocks of moneyed corporations and other securities for his principal. It is a calling of great responsibilities, in which punctuality, honesty, and knowledge are required.

Acting as the stock broker does for others, it is important that all the engagements he enters into should be promptly and faithfully fulfilled, both by himself and the party for whom he contracts. Hence, the language of the agreement of the original associates is suggestive, "such business can only be transacted where there is the utmost confidence, and such confidence is begotten only by public, open, fair, and upright transactions where every party interested may and can know where and how such business is done," and hence, " a great public mart," open to all the associates, was desirable.

It follows, from the very nature of such an organization, with such objects, intents and purposes, that there must be rules and regulations for the good order of the Association, and which rules should be held to be conclusive as to the mode of transacting business between the members, and as to the privilege of admission to, and continued enjoyment of, membership.

As this association is not organized in pursuance of any statute, nor the terms of membership fixed by the principle of the common law, it follows that the agreement which the members make among themselves on the subject, must establish and

determine the rights of the parties on the subject.  The constitution of the association, and its laws agreed upon by the members, contains all the stipulations of the parties, and is the law which should govern.   The members have established a law for themselves.   No person is entitled to membership, in the Open Board of Brokers, except he is approved by the appropriate committee, voted for by the board, and shall agree to, adopt, and affix his name to the constitution, and, having done this, each member should stand by his contract.   Each member is under an obligation to support it himself in all its details, and is under a duty to see to it that it is supported by others.   "As a *means* of *mutual protection*, it is declared to be the duty of every member to report to the board all cases of defalcation of contract of other members, and all cases of refusal or inability to pay differences" (Article 8, of By-Laws).

The very existence of this body depends upon the faithful observance of its organic law by all its members.

The court must regard the constitution and laws of this board as the contract by which all the members are bound. The court cannot make any other contract for the parties than they have solemnly made for themselves.   It is not the province of courts of law to make contracts for parties.   It may explain, interpret, enforce, and, in some instances, where contracts are hard and unconscionable, relieve from them.

But there is no claim in this suit that the terms of this constitution, adopted by the plaintiff, are hard and unconscionable. The plaintiff does not ask to be relieved from his membership, he rather demands that he may be allowed to remain in the association, under the constitution ; he does not wish to be suspended, or have his connection determined and ended.   In an organization of the character of the Open Board of Brokers, with its several hundred members, the business transacted at its room being daily large in amount, and the stocks and securities dealt in being ever fluctuating in value, it was not unreasonable to apprehend that there would be constantly occurring differences between members, acting as agents for others, in regard to the terms of contracts, and as to the obligations and duties of contracting parties under agreements often hastily made.

The temptation to avoid a contract in a rapidly rising or falling market, as the pecuniary interest of a party might prompt, rendered it imperative that some tribunal in the body of the association, should be appointed and agreed upon, to take cognizance of and exercise jurisdiction over all claims and matters of difference which might arise between members of the board. This appears the more important, as confidence in each other, and in the engagements which they might make, one with the other, and in the fairness, openness, and uprightness of their transactions, and in the certainty that their engagements would be fulfilled, are announced as the causes which led to the organization. To be effective, their decisions should be prompt. As these engagements would be constantly maturing, it was eminently proper that a tribunal should be near to render speedy and exact justice. Confidence is the real life of such engagements; hence, the appointment of a committee of arbitration is a prominent feature in the constitution of this board, and, by the express assent of each member, jurisdiction is awarded to this committee in advance of all claims and matters of difference which might arise between the members. The associates have agreed, among themselves, that the decisions of this committee shall have conclusive force, and that the members shall be bound by them; and each member is truly bound by such decisions so far as they are made the basis of subsequent action in the board to secure its good government and its constitution.

Let us apply the above principles to the claim before us. A claim and matter of difference arose between the plaintiff, a member of the board, and Currie, Martin & Co., also members, growing out of their respective rights and obligations, under a contract for the purchase of 1,000 shares of Hudson River Railroad stock, agreed to be sold and delivered by plaintiff to them. This contract was made at the board, and between its members. It was in respect to a transaction embraced directly within the objects and purposes for which the association was formed. Currie, Martin & Co. claimed the right, under the contract, to subscribe for the increased stock proposed by the railroad company to be issued, and they elected to do so, and looked to plaintiff for the same. This claim to subscribe for

the additional stock was not admitted by plaintiff. Currie, Martin & Co. claimed of plaintiff a deposit of additional margin under the contract, which was refused; they then notified plaintiff that they should, under the rules of the board, purchase 2,000 shares of said stock on plaintiff's account, against which proposed action plaintiff protested. The stock was bought by the president of the board under the rules, of which plaintiff was notified. He refused to recognize the transaction, or pay for the stock, and Currie, Martin & Co. paid for it, and made a claim and demand on plaintiff for a large sum of money, the difference in their favor. The justice of the claim was denied, and its payment refused by plaintiff.

This was a claim and matter of difference over which the arbitration committee had jurisdiction so soon as the case should be brought before it. It was presented to the committee by the claimants, and an examination and adjudication upon it demanded. A day for hearing was appointed, and plaintiff summoned to appear and answer, and interpose his defense. The plaintiff declined to appear before the committee, claiming that there was nothing to be submitted, and that there was no difference between him and Currie, Martin & Co.

Now, the facts clearly show that there was a real and substantial difference between these parties; claims were presented on the one side to a large amount, growing out of the contract, and denied on the other. If the parties had agreed in regard to their respective rights, then there would have been no claim or difference, but they were very far apart. The question is not whether the claim of Currie, Martin & Co. was right or wrong in itself, just or unjust. There was a difference, which was to be adjusted, and of which the plaintiff, when he became a member, had agreed that the committee should take cognizance. The plaintiff seems to rest in the belief that because he denied that Currie, Martin & Co. had a claim, that therefore there was none in their favor; he would decide the matter for himself. Now it happens that much of the real business of courts of law arises from the assertion of a claim by the plaintiff and its entire denial by the defendant, yet the action proceeds to trial and final determination, and it is no uncommon

White v. Brownell.

occurrence that the party who denies the claim fails in his defense.

A claim " is a demand of a right or a *supposed right*, a calling on another for something due, or *supposed to be due* (Webster's Dic.)

And wherever there is a disagreement in opinion in regard to a contract, or a matter in controversy exists between the parties to it, there is a " *difference* " such as the committee might properly adjudicate, and of which it was bound to take cognizance.

The committee, in the absence of the plaintiff, heard and determined the matter upon the statements of the claimants, and rendered judgment in their favor. Plaintiff had a right to appear and make his objections, and set up his defense; this he refused to do. After the award was made, he could perform it and retain his rights as a member; this he declined to do. He might appeal to the Board of Appeals, and this he refused to do. Having made up his mind that Currie, Martin & Co. had no claim, he concluded that he need interpose no defense, nor take any steps to reverse the decision, and could treat the award as a nullity. The plaintiff cannot assume this position and still claim the rights of membership. He cannot invoke the aid of this court to protect him in all the rights and advantages of the association, and which he alleges are a great source of benefit to him, and still be allowed to disregard his duties under the constitution and laws of the board.

The plaintiff agreed, when he became a member, that the arbitration committee should take notice of all claims and differences between members, and that he would be bound by their decision. He refused either to acknowledge its conclusive force, in a case in which he was interested, or to appeal from its decision. The constitution must be taken as a whole. The contracting part is an entirety. All its obligations are to be assumed and discharged; all its benefits are to be enjoyed. The enjoyment of the latter depends upon the performance of the former. Were it otherwise, the association would be of no real advantage to its members. It clearly appears that good faith in the observance of the constitutional obligations of the mem-

bers was intended to furnish a test for the right of continued membership.

There was some discussion on the argument of this motion as to the right of the plaintiff to revoke his consent to the jurisdiction of the arbitration committee over the claim and difference in question. In an action in a court of law to enforce the award, such question might be raised; for the purposes of this action, under the facts of the case, it can give him no relief. If the plaintiff would revoke the part of his agreement with his associates which imposes duties and obligations upon him, he cannot insist, in a court of equity, that he shall be protected in the enjoyment of rights and privileges created by the same contract. He that would have equity must do equity.

After the action had before the arbitration committee, no appeal having been taken, proper steps were taken to bring the facts and circumstances involved in this controversy between plaintiff and Currie, Martin & Co., and the default of plaintiff, before the committee on membership. The matter was investigated, and this committee reported to the president of the board that plaintiff was in default under the contract. The president of the board, as was his duty, declared the plaintiff suspended.

This suspension operates as a deprival, during its continuance, of all plaintiff's privileges as a member, including an exclusion from the rooms of the board; but this declaration of suspension is not final. There is reserved to the plaintiff a right of appeal to the executive committee. The jurisdiction of this committee is ample to render and do complete justice. It has full power to hear and *investigate* the matter, and to report the result to the board itself; if it shall appear that the suspension is just, it shall be confirmed; otherwise it shall be annulled. The plaintiff has taken such appeal to the executive committee. He has placed his case in a way to be investigated, and finally decided by the board itself. Having gone thus far he pauses, he fails to prosecute his appeal; in fact has forbidden the appropriate tribunal to take cognizance of his appeal.

At this step, and with his appeal pending, he asks this court in effect to annul all that has been done by the associa-

tion in the investigation and disposition of this matter by the officers and committees of the board. He asks this court to restore him to and protect him in the enjoyment of all his privileges and rights as a member, to give him regular standing in the organization, although its records show him to be in default, and the decree of his suspension to be unrevoked.

There are allegations in the complaint which claim that some of the members of the committee had prejudged the plaintiff's case; but in the protest which plaintiff served upon the committee, he does not place his refusal to submit or appear on any such ground. He makes no objection to the competency or fairness of the committee. He expressly assigns for his refusal, that no matters of difference have arisen between him and Currie, Martin & Co., and that they have no claim. If any such objections as he now mentions existed, he should have asserted them at the proper time, that appropriate action could be taken by the association of which he was a member.

The plaintiff also charges the officers, committees, and a portion of its members sufficient to control its action, with a disposition to deny him justice, and deprive him of his rights; but all the allegations on the subject are denied by the answer of the President.

This court, under its equitable powers, can give the plaintiff no relief under the facts disclosed. Plaintiff has unexhausted remedies for all his complaints and grievances under the constitution and laws of the board. There is no occasion for the intervention of this court. When he became a member he submitted to its laws, which afford full and complete relief. The equity of the complaint is denied.

Motion to dissolve injunction granted.

From the order dissolving the injunction, the plaintiff appealed to the general term.

*William C. Barrett*, for appellant.

I. The open board of stock brokers is a voluntary association subject to equitable jurisdiction, and to be treated in a court of equity by those rules which govern in the cases of

partnerships. Even if it be treated strictly as a voluntary association and not in any respect as a partnership, the plaintiff is still entitled to the redress which he seeks.

II. The suspension of the plaintiff was wholly illegal, and was not even regular under the constitution and by-laws of the board itself.

The case of *Austin* against *Searing* (16 N. Y. 112), is only distinguishable from the present, in that the question there was one of forfeiture, not of membership, but of property, in a voluntary association. The forfeiture of membership must be more serious in its practical effect than the forfeiture of property; but were it otherwise, and were the case of *Austin* v. *Searing* not to be treated as an absolute guide for an adjudication of the case at bar, still it is exceedingly valuable for the purpose of ascertaining the spirit of the court of last resort in dealing with these voluntary associations.

In *Lloyd* v. *Loaring* (6 Ves. 773), Lord Eldon alludes, with considerable sharpness, to the great affectation of corporate power and character exhibited by the constitution and by-laws of the voluntary association then under consideration.

See also upon the question of submission to arbitration: *Haggart* v. *Morgan* (5 N. Y. 422); *Mitchell* v. *Harris* (2 Ves. Jur. 129 Summer's Ed. and Note; 8 T. R. 139); 2 Stor. Eq. Jur. Secs. 1457, 1458; *Simons* v. *Monier* (29 Barb. 419); *Smith* v. *Compton* (20 Barb. 262).

In the case of *Wells* v. *Gates* (18 Barb. 554), the court holds: "That in this State personal responsibility on the part of individuals constituting an association of any sort, to the full extent of the indebtedness of the association to third parties, can only be avoided by their becoming a corporation or a *quasi* corporation, and that companies or societies which are not sanctioned expressly by the legislature pursuant to some general or special law, are nothing more than ordinary partnerships, and the laws respecting them are the same."

Now, this association of stock brokers is formed under no law, general or special, and is simply formed by the signature of the members to what may be called the articles of copartnership, viz.—the constitution and by-laws.

This case of *Wells* v. *Gates* was followed in the case of *Dennis* v. *Kennedy* (19 Barb. 517), and a similar rule has been laid down, even in the case of joint stock associations; see *Allen* v. *Sewall* (2 Wend. 327); *Moss* v. *Oakley* (2 Hill, 265); *Bailey* v. *Bancker* (3 Hill, 188); *Harger* v. *McCullough* (2 Denio, 119); *Corning* v. *McCollough* (1 N. Y. 47).

In the case of *The St. James' Club* (13 Eng. Law and Eq. 592), a question arose before the Lord Chancellor, Lord St. Leonards, in respect to the rights of members in an ordinary club. Lord St. Leonards said that if the club was dissolved, the members would have a right to a share of the assets. He would lose the convenience of the club, but he would get a share of the assets; otherwise he would only have a right of admission to the enjoyment of the club.

In the case at bar the objects of the association are not pleasure or convenience, and there is therefore a still stronger reason for the claim, that the member is a joint tenant in and vested, in common with the other members, with all the assets, franchises, and privileges of the association. That he is clearly liable for the debts will scarcely be disputed. Mr. White, for instance, while to-day prevented by his fellow members from enjoying his rights as a member, is clearly liable to an action by the creditors of the association; and it is not perfectly clear that if, in any such action, he should plead his suspension by the act of his associates as a defense, it would be stricken out as frivolous.

So here, then, is presented the singular spectacle of a man fully vested, in common with all the other members with all the assets of the association, and liable for its debts, yet denied access to its apartments, and prevented from enjoying any of the privileges for which he has assumed those liabilities, for which he has paid his money, and which are the concomitants of his vested interest in the assets.

A distinction was made in England, in the case of ordinary clubs conducted upon ready money principles, to the effect that a tradesman supplying goods to such a club, does so upon the credit of the funds, and that, *at law*, the members of such a club are not individually liable for debts incurred by its com-

mittee (*Caldicott* v. *Griffiths*, 22 Eng. Law and Eq. 527; and cases there cited in the briefs of counsel). This distinction, however, is only applicable to proceedings at law as between the creditors of the association and the members. They have, however, invariably been treated and dealt with in the courts of equity as partnerships (Collyer on Part. sec. 53; *Beaumont* v. *Meredith*, 3 Ves. & B. 180; *Greenwood's case*, 23 Eng. Law and Eq. 422; *Richardson* v. *Hastings*, 29 Eng. Chan. 323). And the courts of equity have invariably examined and considered the reasons for the expulsion of members; and, if injustice has been done, they have been prompt in correcting abuses and affording adequate redress; and that, too, in cases where the equities were infinitesimal, compared with the present (*Innes* v. *Wylie*, 1 Carr & Kir. 257; *Ex parte Wooldridge*, 1 Ellis, B. & S. 844; *Blisset* v. *Daniel*, 23 Eng. Law and Eq. 105; *Regina* v. *Mallinson*, 1 Eng. Law and Eq. 289; *Bury* v. *Cross*, 3 Sand. Ch. R. 1; *The Commonwealth* v. *Pike Ben. Soc.* 8 Watts & S. 247).

In *Gormon* v. *Russell* (14 Cal. 531), it was distinctly held—citing *Lloyd* v. *Loaring* (6 Ves. 773); *Cockburn* v. *Thompson* (6 Ves. 322); *Pierce* v. *Piper* (17 Ves. 8); *Beaumont* v. *Meredith* (3 Ves. & Beam. 180), where the Chancellor said, that "The society can be considered in this court only as a partnership" (Collyer on Part. § 553; Gow on Part. 2, 227; *Babb* v. *Reed*, 5 Rawle, 151)—that voluntary associations for mutual relief in sickness or distress, by funds raised by initiation fees, fines, dues, &c., are partnerships, and may be dissolved by a court of equity if they improperly exclude a member.

The general rule is, that corporations can exercise this jurisdiction only in cases of offenses recognized by common law as cause for expulsion. Of these there are but three: (1.) Violation of duty to the society, as a *member* of the corporation; (2.) Offenses as a citizen against the laws of the country; (3.) Breach of duty in respect alike to the corporation and the laws (2 Burr. 732).

In the case of *The People* v. *The Med. Society of Erie* (24 Barb. 570), affirmed in the Court of Appeals in 32 N. Y. 18, a medical society expelled a member for charging less than the

White v. Brownell.

sum which had been fixed and established by them as the tariff of fees for medical services performed by its members.

It was held that the power given to them to make regulations relative to the expulsion of members, although conferred in general terms, was not an arbitrary, unlimited power; and that, notwithstanding such by-law, the society had no right to expel the member, for the reason that such by-law was unreasonable and oppressive upon the members, and interfered with their private rights. The learned judge stated, that expulsion or disfranchisement is a matter of serious import, and should not be permitted, unless the member is guilty of such offense as tends to work the destruction of the body corporate, or the destruction of the labor and privileges thereof. In the Court of Appeals, Judge Parker satirized the regulations embodied in the so-called code, and treated them as null and void. At the same time he expressed a very decided opinion against the sharp and summary judgment of such bodies (see *The Commonwealth of the St. Pat. Ben. Society*, 2 Binn. R. 511; *Green* v. *The African M. E. Society*, 1 S. & R. 254; *The Commonwealth* v. *The German Soc.* 15 Penn. State R. 251; *Fuller* v. *Trust. Acad. Sch. in Plainfield*, 6 Conn. 533).

Some objection was taken upon the argument to the form of the relief sought, but it is submitted that the plaintiff was clearly entitled to it upon several grounds :

*First*. He is entitled to it upon the ground that his copartners or cotenants seek to exclude him from taking that part in the concern which he is entitled to take (Story on Part. (3d ed.) p. 356, note; *Wilson* v. *Greenwood*, 1 Swanst. R. 481; Collyer on Part. B. 2, ch. 3, sec. 6, pp. 240, 241, 2d ed).

*Second*. Also upon the ground that one partner may apply to a court of equity to restrain the oppression and overbearing of another partner (*Charlton* v. *Poulter*, 1 Ves. 429, and 19 Ves. 148; Story, Part. § 227; Collyer on Part. b. 2, ch. 3, § 5, p. 313).

*Third*. And the plaintiff is entitled to the relief sought, although he does not ask a dissolution of the association. In fact, he is not entitled to a dissolution, unless the court sees that redress cannot be afforded without a winding up (Gow on Part. ch. 2, sec. 4, pp. 111, 112, 3d ed.; *Charlton* v. *Poulter*, 19 Ves. 148).

*Fourth.* The opinion that a partner's misconduct may be restrained by an injunction without the necessity of a dissolution is sanctioned by Lord Eldon (*Goodman* v. *Whitcomb*, 1 Jac. & Walt. 572).

*Fifth.* And if not a partner, he would still be entitled to an injunction on the well-known ground and principle of irreparable injury and the total destruction of business (*Carpenter* v. *Gwynn*, 35 Barb. 395; *Livingston* v. *Livingston*, 6 John Ch. 497; *Holdane* v. *Trustees &c.* 21 N. Y. 474; S. C. 23 Barb. 103).

It was also claimed that the plaintiff was not entitled to an injunction until the final hearing, but,

*First.* It is plain that there has not been an attempt to deny a single prominent fact upon which the equities rest. The case, therefore, is to be treated as upon the hearing (*Grimstone* v. *Carter*, 3 Paige, 421).

*Second.* But had the equities been denied, it is a clear case of irreparable injury; nay more, of ruin and destruction to a man's business; a case without remedy of any kind at law—no pretence that a *mandamus, quo warranto,* or even the useless action for damages would lie: in fact, a case of absolute and entire ruin, and that ruin between now and the hearing. An injunction was never refused under such circumstances. It has been granted with far less equity (*Livingston* v. *Livingston*, 6 John. Ch. 497; *Spear* v. *Cutler*, 2 Code R. 100; *Dubois* v. *Budlong*, 15 Abb. Pr. 445; *Ryckman* v. *Coleman*, 21 How. Pr. 404).

*Third.* And it is by no means of course to dissolve an injunction upon a full denial of the equity of the bill, if the court, in the exercise of a sound discretion, can see a good ground for retaining it—and if ever, in such cases, rests in the sound discretion of the court (*Bank Monroe* v. *Shermerhorn*, Clark, 303; *Benson* v. *The Mayor*, etc., 10 Barb. 223; *Vermilye* v. *Vermilye*, 14 How. Pr. 470).

*Fourth.* The rule, even in an ordinary case, without any of the extraordinary equities of this, is to continue the injunction, if upon the papers there is probable cause for the belief that the plaintiff will be ultimately decreed the relief asked, or if the rights sought to be protected are free from reasonable doubt

(*Snowden* v. *Noah*, Hopk. R. 347; *Bruce* v. *Del. & Hud. Can. Co.* 19 Barb. 371).

*Fifth.* The preliminary injunction cannot possibly prejudice the defendant; while without it, the plaintiff is a ruined man. This is a well settled ground for retaining a preliminary injunction, even when all the equities are denied (*Carpenter* v. *Danforth*, 19 Abb. Pr. 225; *Church Hol. In.* v. *Keech*, 5 Bosw. 691).

Another point was made below, based upon the undoubted rule that a court of equity will not aid a party in specifically enforcing a contract - which he himself has violated. But White did not violate the contract. Every agreement must have a fair and reasonable construction. The agreement in question never contemplated that a member should put his head in the noose. It cannot be said that there is even a moral delinquency in refusing to submit a controversy involving all a man has to a tribunal openly, publicly, and avowedly biased, prejudiced, and which has already made up its mind.

Even if White had been guilty of a breach of his agreement, would a court of equity, for that reason, allow him to be treated as a pariah. A plaintiff is never denied full equity because of his refusal to abide by an agreement enforceable neither at law nor in equity, and which both law and equity condemn, as a direct usurpation of the functions of the courts.

The plaintiff does not come into court with unclean hands, because of a refusal which law and equity commend (Story, Equity Jur. §§ 670, 1457; *Austin* v. *Searing*, 16 N. Y. 112).

*William R. Martin*, for respondent.

I. The constitution and by-laws of the Open Board are a contract between its members. They provide for the suspension of a member, and the plaintiff was suspended in precise conformity therewith, and was rightly suspended.

He has signed its constitution, and pledged himself to abide by the same, and also by its by-laws, resolutions, and rules (Con. Art. 16). These instruments, therefore, become his

contract with his fellow members, and the case before the court
is primarily one of the construction of contract. In *Austin* v.
*Searing* (16 N. Y. 121), it was held "that these constitutions
were contracts, and must be subject to the same rules with
all other contracts." One of the provisions of this contract is
for the suspension of members; and our proposition is, that he
was suspended in precise conformity with the terms of this con-
tract, and rightly suspended; that he is liable to the conse-
quences that follow a strict performance of that contract by his
associates; and that he would not be entitled to any relief, on
the ground that the contract was improvident, or that its pro-
visions were onerous, even if such were the case (*Troy Iron
&c. Factory* v. *Corning*, 45 Barb. 231).

II. In order to import into this case an equitable ground
for the injunction, it is asserted that this association is a part-
nership; and upon that, that the general principles of partner-
ship warrant the injunction, *i. e.*, whatever a partner may do,
this plaintiff may do. (*A.*) This association is not a partnership.
It wholly lacks the characteristics of a partnership.

They are like a partnership in nothing else than that they
are not a single individual. They are not a joint stock associa-
tion, nor a new invention, nor any thing indescribable. They
are in fact a club—neither more or less than a club. These
institutions are known to the courts, and their rights and status
have been adjudicated upon in the English courts for a century.
A club is a society which gives to its members social and per-
sonal rights and privileges, in such direction as they determine,
within the whole range of social, artistic, literary, political, or
business objects, &c., &c. Their main point is the strict quali-
fications for membership, and the conditions of its tenure.
Their rights of property are the same as the rights of property
in this association. The only point of distinction of this associa-
tion from a club is the very point in which all clubs differ—the
object (see Lindley on Partnership, page 62, and cases cited;
and *Cox* v. *Hickman*, 8 H. L. Cas. 268; *Caldicott* v. *Griffiths*,
8 Exch. R. 898). (*B.*) Nor, in the second place, if this asso-
ciation were a partnership, would the special facts of this case
warrant an injunction. The plaintiff has, in this association, a

personal or social right of attendance, and of doing his business there, in conformity with their rules and regulations, that is, in conformity with the provisions of his contract.

He has also his share in the accumulated fund. He is suspended, but not expelled, from membership. His personal right of attendance is gone, but his property is not forfeited or affected. This distinction, therefore, is applicable to this case. That the rules of law which protect rights of property, do not in like manner apply where simply personal or social rights, as here, are in question.

The cases in which injunctions have issued in actions between partners show that they issue against partners only where they have been guilty of a breach of the contract, or of misconduct in a point not covered by the contract (Eden on Inj. p. 220 ; 2 Lindley, Part. pp. 1002, 1009). Here no breach of the contract by the defendants is alleged (see *Hall* v. *Hall*, 12 Beavan, 414 ; *Watney* v. *Wells*, 30 Beavan, 56 ; *Harrison* v. *Tennant*, 21 Beavan, 482).

These cases show that, as against partners guilty of misconduct, but not of a breach of the contract, an injunction will not be issued to sustain a partner in his purely personal rights, where no rights of property are involved, and, further, where the continuance of the partnership was sought, the court would not fail to consider whether the injunction would not be to the mutual injury of the partners, in which case the partnership would be dissolved.

III. The provision for arbitration in the constitution was the subject of much criticism. It was argued: That the plaintiff was not bound by the arbitration clause. That he might refuse to arbitrate, and that no consequence attached to the refusal ; that a suspension must be preceded by a default. That he revoked the agreement to arbitrate, and that the law favors revocations. That he did not agree to submit; but, only, that in case he did submit, the arbitration committee was to be the tribunal. That the arbitration committee had no power to determine the fact of default. That this court must pass upon it, as a question of fact and of law upon all the special facts of the contract, whether the plaintiff was in default within Art. 8, By-laws.

IV. There is no rule or principle of law denying to a man the natural liberty of waiving a remedy before the tribunals of justice, and accepting as final, in respect to his rights, the act or arbitrament of some private person (see the recent leading case in House of Lords, *Scott* v. *Avery*, 5 H. L. Cas. 811).

It is clearly settled in this case that a man may contract for a final private adjudication of his rights, and make such arbitrament the condition precedent of some other right. This case has been followed in the Court of Exchequer, in *Horton* v. *Sayer* (5 Jur. N. S. 989); *Lee* v. *Page* (7 Jur. N. S. 768); and in *Scott* v. *Liverpool* (27 L. J. p. 641); *Tredwen* v. *Holman* (8 Jur. N. S. 1080); *Westwood* v. *Sec. State for India* (7 L. T. N. S. Q. B. 736); *Braunstein* v. *Accidental Ins. Co.* (31 L. J. Q. B. 17).

These cases are all reviewed in the recent case of *Elliott* v. *Royal Ex. Ass. Co.* (Law Rep. 2 Exch. 237). (See *Inman* v. *Western Fire Ins. Co.* 12 Wend. 459–60; *Ranger* v. *Great Western R. Co.* 27 Eng. L. and Eq. 46; *Northampton Gas Co.* v. *Parnell*, 15 Com. Bench, 651; *Faunce* v. *Burke*, 16 Penn. St. 479). These cases fully establish the principle that a man may, by contract, agree to waive his right to resort to the courts, and to submit any questions to private arbitration.

V. Now, under these rules, what is the plaintiff's position? He had agreed, by the constitution, that when a claim or matter of difference arose against him, it should be the duty of the arbitration committee to take cognizance of, and exercise jurisdiction over it. It was not a conditional agreement that, in case he elected to submit to arbitrate, they should be the tribunal; but a positive agreement that the committee should have jurisdiction of the subject-matter whenever it arose; and he further agreed that their decision should be binding. The moment Currie, Martin & Co. made claim against him, and he refused to acquiesce in it, the arbitration committee acquired jurisdiction of the subject-matter. Due notice was then given to him that they would hear the case; thus they acquired jurisdiction of the person of Mr. White. He stood at the meeting of two ways: (1.) He could submit to, and proceed before, the arbitrators. (2.) He could stand on what he was

advised were his legal rights, take the question away to the adjudication of the courts of law, revoke his submission, or in any way disregard the arbitration. The only thing he did do was to serve a protest.

The arbitration went on, the committee saw the documentary evidence, and decided against him. Then he again had this election : (1.) He could perform ; in which case the incident would have terminated. (2.) He could refuse to perform, on any ground satisfactory to himself, and accept the consequence —his suspension. Now, there are two inevitable, necessary consequences : (1.) His suspension was the result of his own act. (2.) The fact of the default was ascertained, so far as the members of the association were concerned.

So far as it can come in question here, on this question of his membership, the award is binding on him. No question arises here concerning the correctness of the decision against the plaintiff, either in point of law or in matter of fact. Where one's rights are thus submitted to a private tribunal, there may be an action to relieve against fraud; for such a remedy may be had, not only as against the awards of arbitrators, but even against judgments of the highest courts (*Munn* v. *Worrall*, 16 Barb. 227).

Either at law or in equity, the judgments of a tribunal, constituted and chosen by the parties themselves, may be overhauled for fraud in the prevailing party, or for some misbehavior of the tribunal, as in refusing to bear evidence, or to hear the party, or the like ; or for an excess of authority in assuming to decide a matter not embraced in the submission. But for error of judgment, however plain and palpable, there is no remedy; the party must abide the forum which he has selected; and he cannot have a writ of error, or an appeal to the legally constituted tribunals (Van Vechten, Senator, in *Underhill* v. *Van Cortlandt*, 17 Johns. 430 ; see pages 412, 413, 416, 421, 2 Story Eq. Jur. § 1451, *et seq.* ; *Ketchum* v. *Woodruff*, 24 Barb. 147 ; *Phillips* v. *Evans*, 12 Mees. & W. 309).

VI. This is an attempt by a member of an unincorporated association to procure from the courts the same remedies for the enforcement of his social privileges therein, according to its

articles of association, that the courts, by *mandamus* and injunction, have been accustomed to afford to members of corporations. It assumes that the courts will recognize the agents and servants of this society, as they would the officers of a corporation, and will compel them to perform their official duties by compulsory process, issued in regular actions of the same nature as those allowed to corporations. The relief asked in this action, and afforded by the injunction, is, that the plaintiff may have the full exercise and enjoyment of his rights and privileges as a member of the board, and that he may, at their meetings, transact all his business, in buying and selling stock, &c., fully, freely, and with the same facilities enjoyed by the other members, and as he enjoyed them previously to his suspension.

Now, this requires the court to interfere in the internal management of an association that has no legal existence, in favor of a member who has been suspended according to its rules, none of whose rights of property have been violated, in support of his purely personal and social rights against the other members, who have strictly followed their rules, and who have not been guilty of any misconduct.

This injunction is, in fact and substance, mandatory, and not prohibitory. The plaintiff's complaint is, that he is excluded from membership. The effect of the injunction is to direct the defendants to perform to him all the services they did before the suspension—to give him the same relief pending the action that he would gain by final judgment in his favor. Such injunctions " the court will not grant, except under very special circumstances." (Daniel Chy. Prac. 4th ed. p. 1503; *Hooper* v. *Brodrick*, 11 Simons, 47; *Isenberg* v. *East India Ho. Co.* 10 Jur. N. S. 221; *Durell* v. *Pritchard*, 35 L. J. 223; *Brown* v. *Monmouthshire Railway*, 13 Beavan, 32; *Bailey* v. *Birkenhead Railway*, 12 Beavan, 433; *Ex parte Ford*, 7 Vesey, 617; *Waters* v. *Taylor*, 15 Vesey, 19, 21; *Carlen* v. *Drury*, 1 Vesey and B. 154; *Thompson* v. *University of London*, 10 Jur. N. S. 669; *Brancker* v. *Roberts*, 7 Jur. N. S. 1185; *Mair* v. *Himalaya Co.* 11 Jur. N. S. 1013; *Chaplin* v. *N. W. Railway Co.* 5 L. T. Rep. 601; *Churchward* v. *Chambers*, 2 Foster and

Finlason, 229; *Lumley* v. *Wagner*, 1 De Gex, M. & G. 604; *Blisset* v. *Daniel*, 10 Hare, 493; *Hopkinson* v. *Marquis of Exeter*, before Lord Romilly, M. R., London Times, December 21, 1867; *Commonwealth* v. *Pike Beneficial Society*, 8 Watts and S. 250; *Commonwealth* v. *St. Patrick's Society*, 2 Binn. 448; *Innes* v. *Wylie*, 1 Car. & Kirwan, 262).

By the Court.—Daly, F. J.—The organization known as the Open Board of Stock Brokers, which the plaintiff asks this court to restrain from depriving him of his rights and privileges as a member of it, is not a partnership, and the plaintiff is not entitled, as has been argued, to the equitable remedies which courts afford for the protection of the rights of a co-partner. It is not a union of persons joining together property, labor or skill for their common benefit, in any pursuit or business having a communion of profit and loss, and distinguishable by the feature that, if earned, there is to be a division of gains. It may be described as an association of persons engaged in the same kind of business, who have organized together for the purpose of establishing certain rules, by which each agrees to be governed in the conduct and management of his separate transactions or business; which is not a partnership.

The objects of the organization are set forth in the articles of association, which declare that greater facilities are requisite for the exchange and negotiation of commercial securities, a business which can be successfully transacted only where there is the utmost confidence; that, as such confidence is begotten only by public, open, fair and upright transactions, so that each party interested can know not only where but how such business is done, the spirit of the age demands for such transactions a great public mart, open to all; and that, for the purpose of supplying these requirements, the persons signing their names associate themselves together, and adopt a constitution for an association to be known as the Open Board of Stock Brokers, each pledging himself to abide by the constitution, and by all by-laws, rules and resolutions which may be passed by the board. To carry out this object, the constitution provides that

there shall be a room where the members of the board shall have seats and desks, conveniently inclosed within a railing, and that outside the railing, and in a gallery, seats shall be provided for the public; certain officers are designated who are to call stocks at the board, and a standing committee to arrange the order in which such securities are called. A record is to be kept by the secretary of all sales and purchases made at the board. He is required to prepare an account of the same for the newspapers, and no fictitious sales are to be allowed. It is, in fact, the creation of a public mart for the sale of stocks or other commercial securities, each purchase or sale of which is not for the joint benefit of the body, but is, as it would be in any other place, an individual transaction between the parties making it. It is analogous to what, in other branches of commerce, has long been familiarly known by the word " *Change*," —a fixed place, where merchants meet at certain hours for the transaction of business with each other, subject to such general rules or understanding as they think proper to be governed by. There may be property belonging to this body, derived from the payment of dues or fines, or consisting of the furniture of the room where the board meets; but the possession of it is a mere incident, and not the main purpose or object of the association. A member has no severable proprietary interest in it, or a right to any proportionable part of it upon withdrawing. He has merely the enjoyment and use of it while he is a member, but the property remains with and belongs to the body while it continues to exist, like a pew, the ultimate and dominant property in which is in the congregation, and not in the pew-holder; and when the body ceases to exist, those who may then be members become entitled to their proportionate share of its assets (*In re The St. James Club*, 13 Eng. Law & Eq. Rep. 592; *Fassett* v. *The First Parish in Boylston*, 19 Pick. 361). This Board of Stock Brokers is in fact analogous to the organization which came under consideration in *Caldicott* v. *Griffith* (8 Exchq. R. 898), called *The Midland Counties Guardian Society for the Protection of Trade*, which was decided not to be a partnership. So far, therefore, as the plaintiff claims the equitable interference of this court upon the assump-

tion that this association is a copartnership, or upon the ground that the rules which regulate the action of courts of equity in cases of partnership are to be applied to it, the claim cannot be supported.

It is not an incorporated body, and as a number of cases have been cited upon the argument in which courts of equity have interfered and restored a member of a corporation who had been expelled or obstructed in the exercise of his franchise by the acts of the corporation, which are relied upon by the plaintiff as authorities applicable to the present case, it will be necessary to inquire into the reasons why corporations cannot expel members except in certain extreme cases, and to show that these reasons do not apply to a voluntary unincorporated body, which comes into existence by the mutual agreement of the persons forming it, and is thereafter carried on under rules which the body adopts for its government. A member of a corporation, whether it be municipal, eleemosynary or private, is in the enjoyment of a franchise, the right to which is not derived from the body, but is created by statute, or exists by prescription, and therefore cannot be taken away by the act of the corporation, except, as I have said, in certain extreme cases. As it is a right conferred by statute, or derived from immemorial custom, which implies the existence of a grant, it can neither be taken away by the act of the corporation, or withheld by the act of the corporation, from any one eligible to the enjoyment of it. Thus, in *The People* v. *The Medical Society of the County of Erie* (32 N. Y. R. 187), an incorporated medical society was compelled by *mandamus* to admit a licensed physician to membership, who was excluded under a by-law which had been adopted by the corporation.

In a corporation, there is a distinction between what is called *amotion*, or the right to remove an officer, which is a power inherent in every corporation, and *disfranchisement*. The former may be exercised without interfering with the franchise, as the officer, when removed, still continues a member; but disfranchisement is an absolute expulsion of the member from the body, and the taking away of his franchise, which cannot be done unless the power is given by the charter creating the

corporation, or the member has been guilty of crime, a conviction of which would work a forfeiture of all civil rights, including the corporate franchise, or has committed acts which tend to the destruction of the corporation, such as the defacing of its charter, the obliteration or alteration of its records, or other acts tending to impair or destroy its title to its rights or privileges; in which case, the expulsion of the member is but the exercise of a power incident to the right of self-preservation (*Evans* v. *The Philadelphia Club*, 50 Pa. St. R. 107; *Bagg's Case*, 11 Coke R. 93; *Earle's Case*, Carthew's R. 173; *Commonwealth* v. *St. Patrick's Benevolent Society*, 2 Binney R. 441; *Fuller* v. *The Trustees of Plainfield Academy*, 6 Conn. 532; *People* v. *The Medical Society of Erie*, 24 Barb. 570; Willcock on Municipal Corporations, 270; Grant on Corporations, pp. 263, 264, 265, 266).

But in an unincorporated voluntary association, like the one now under consideration, the privilege of membership is not given by statute or derived through prescription, as in a corporation, but is created by and conferred by the organization itself. It is not a franchise—a franchise being a particular privilege vested in individuals, which is conferred by a grant from a sovereign or government (Finch's Law, 164; 3 Kent's Com. 458); while, on the contrary, the privilege of membership in a voluntary association is derived exclusively from the body that bestows it, and may be conferred or withheld at its pleasure. The law cannot compel such an organization to admit an individual to membership, as may be done in the case of a corporation, nor can it interfere to restore a member who has been deprived of the privilege for not complying with the conditions upon which the enjoyment of it was made to depend. A member of a body of this description has, as such, undoubtedly, rights which the law will protect, but they do not rest upon the same ground, and are by no means coextensive with the franchise enjoyed by a member of a corporation. They depend upon the nature of the organization, upon the object for which it was formed, and upon the rules, regulations, constitution or by-laws which are explanatory of its purpose, and which the body has adopted for its government.

Individuals who form themselves together into a voluntary association for a common object may agree to be governed by such rules as they think proper to adopt, if there is nothing in them in conflict with the law of the land; and those who become members of the body are presumed to know them, to have assented to them, and they are bound by them (*Innes* v. *Wylie*, 1 Car. & Kir. R. 262 ; *Brancker* v. *Roberts*, 7 Jur. N. S. 1185 ; *Hopkinson* v. *The Marquis of Exeter*, London Times, Dec. 31st, 1867, Law R. ; 5 Eq. Ca. 63).

Such an organization may prescribe the conditions upon which persons will be admitted to membership, as well as the conditions upon which the continuance of membership will depend; and where they have no regulation upon the subject, they may expel a member by a vote of the majority, if he has been notified of the charge against him, and afforded an opportunity of being heard in his defense (*Innes* v. *Wylie, supra*). Voluntary bodies of this kind will be held to the fair and honest administration of the rules which are in force when any proceeding is instituted against a member ; but where a member is expelled in conformity with the rules, and the proceedings are regular and in good faith, it is final, and no judicial tribunal can interfere (*The Commonwealth* v. *The Pike Beneficial Society*, 8 Watts & Serg. 250). The only question, therefore, that can arise in the present case is whether the plaintiff was suspended from the privileges of a member of this Open Board of Stock Brokers in accordance with the constitution and by-laws which that body has adopted for its government ; for if he was, he has no ground of complaint.

The by-laws of the board provide that whenever a member is in default on any contract, and the fact becomes known to the committee on membership, they shall, after due investigation, report the same without delay, through their chairman, to the president of the board, who shall at once declare the member so reported suspended from all the privileges and immunities of the organization ; and that the member may, within sixty days, appeal and demand a hearing before the executive committee, who are required to give notice at the board at least five business days before the hearing of the appeal, to

enable any person interested to present objections. The executive committee are required by the by-law to report the result of their investigations, and if it appear that the complaint is just, the declaration of suspension is to be confirmed, otherwise annulled. It is provided, in addition to this, by the constitution, that there shall be an arbitration committee to take cognizance of and to exercise jurisdiction over all *claims* and all *matters of difference* between the members of the board, whose decision shall be binding. And the constitution further provides, that an appeal may be taken from the judgment of the arbitration committee to a board of appeals, which board, it is declared, shall take cognizance of all cases of appeal from the judgment of the arbitration committee.

The plaintiff had a contract with the firm of Currie, Martin & Co., who are also members of the board, for the purchase by them from the plaintiff of a thousand shares of the Hudson River Railroad stock, to be delivered at the plaintiff's option, at any time during the year 1867. After the making of this contract, the Hudson River Railroad Company adopted resolutions increasing the capital stock of the Company, in which they provided that the persons in whose names stock should be standing on the 10th of April, 1867, might, before the 15th of the month, subscribe for an equal amount of the additional stock, at one-half its par value. Currie, Martin & Co. claimed that, under the contract, the plaintiff was bound to subscribe for one thousand shares of the additional stock for them, insisting that they were rightfully entitled, under the contract, to the benefit of the increase; but this claim the plaintiff refused to admit. By the conditions of the contract, either party were entitled to call for additional deposits, from time to time, to meet the fluctuations in the market; and by a by-law of the board, either party, upon all time contracts, may call, at any time during the continuance of the contract, for a united deposit of ten per cent.; and if either party fail to comply, the other may elect to close the contract.

Currie, Martin & Co. made a call upon the plaintiff for an additional deposit of ten per cent., making an additional deposit of the amount themselves; but the plaintiff refused to

make any additional deposit, whereupon Currie, Martin & Co. elected to close the contract, and notified the plaintiff that they would purchase two thousand shares of the stock for his account and at his risk, under another by-law of the board, which provides, that if any member neglect to fulfill his contract after being duly notified, the other party may employ any one of certain designated officers of the board to buy or sell the stock, as the case may be, either in open market or at the board, accounting to the member in default for any surplus, and charging him with any deficiency. Upon receiving this notice from Currie, Martin & Co., the plaintiff sent a notice to the president of the board protesting against the purchasing of any of the stock upon his account, under the contract, claiming that he was not in default; but the president complied with the request of Currie, Martin & Co. and purchased two thousand shares, and Currie, Martin & Co. notified the plaintiff of the purchase as a purchase under the rule, upon his account and at his risk; which purchase was made at a ratec reating a difference in their favor, and, as they insisted, against the plaintiff, of $69,633.34.

This sum Currie, Martin & Co. claimed of the plaintiff, and he refused to pay it, whereupon they brought the question, as a claim and matter of difference under the provision in the constitution heretofore referred to, before the arbitration committee, demanding that they should inquire into and decide it; and the committee appointed a day for the hearing, and notified the plaintiff to appear before them and interpose whatever objection or defense he might have; to which the plaintiff replied by a written communication, declining to appear before the committee, protesting against their jurisdiction in the matter, and declaring that no matters of difference had arisen between him and Currie, Martin & Co., that that firm had no claim of any kind against him, that the contract made with them was in full force and effect, and that nothing had arisen under it calling for any action of the arbitration committee.

Upon the day appointed, Currie, Martin & Co. appeared before the committee, and the plaintiff did not. The former presented their claim and gave evidence of the facts upon

which it was based, and the committee, by a report or award in writing, decided that Currie, Martin & Co. were entitled, under the contract, to one thousand additional shares of the stock, having notified the plaintiff that they elected to subscribe for the same; that the plaintiff was in default, having failed to respond to Currie, Martin & Co.'s call for an additional deposit; that by the by-laws it was, after such default, at the option of Currie, Martin & Co. to elect to close the contract, and that they did elect to close it; and the arbitration committee rendered, as they expressed it, judgment in favor of Currie, Martin & Co., and against the plaintiff, for the sum of $69,633.34.

Currie, Martin & Co. then made known to the committee on membership the decision of the committee on arbitration, and the committee on membership, upon due investigation, as it is averred in the answer, reported to the president that the plaintiff was in default upon his contract with Currie, Martin & Co., upon which the president declared the plaintiff suspended from his privileges as a member of the board. The plaintiff appealed from the act of the president to the executive committee, but before any decision was had upon this appeal he brought this action to restrain the president and the members of the board, by injunction, from interfering with him in " the full and free exercise and enjoyment of all his rights, privileges and franchises" as a member of the body. He avers in the complaint that he has daily and repeatedly urged upon the president the calling of the executive committee together, and the granting to him of a hearing, but has been unable to procure it, from the failure of a quorum to attend; and alleges, upon information and belief, that, the failure and delay was at the instigation of Currie, Martin & Co., and was part of a general plan on their part, and other members of the board, to deny him justice and prevent him enjoying his privileges as a member; while the president avers in answer, that he took measures to call the committee together, but that the plaintiff brought this action before a meeting could be had—before it was possible to give any kind of reasonable notice to its members, and before the committee could

give the notice required by the by-laws; so that this averment on the part of the plaintiff of an intentional delay, which he makes upon information and belief, must be regarded as substantially denied; in addition to which, the president avers, that after the service of the preliminary injunction, a meeting of the committee was had, and that the plaintiff was notified that they were willing and desirous that he should appear before them and have a hearing, and that he appeared before them, after consulting with his counsel, and refused to prosecute his appeal, protesting against and forbidding the committee to take any action in the matter.

The effect of this award made by the arbitration committee has been elaborately discussed upon the argument; but many of the points raised do not and cannot come under consideration here. Currie, Martin & Co. are not defendants in this action, nor is this a proceeding to confirm the award and for judgment in accordance with it. We are not called upon, therefore, to say whether it did or could have any effect upon the legal rights of the parties to the contract for the purchase of the stock; nor whether the by-law of the board under which the committee acted had the same effect as an ordinary submission in writing of a matter in difference to arbitration, so as to be conclusive upon the parties upon the award being made; nor whether the protest of the plaintiff was a revocation of the submission which, in an ordinary arbitration, is a right which either party may exercise at any time before the matter is finally submitted, upon a hearing, for a decision of the arbitrators. The action of this committee comes under consideration here merely as a part of the proceedings by which it was determined that the plaintiff should be suspended from the privileges of a member of the board, and it is only in that light that I shall consider it.

The constitution declares that the by-laws shall provide for the expulsion, suspension, and readmission of members for cause, and the by-laws declare that a member being in default in any contract shall be a cause for suspension. The committee on membership, when it is made known to them that a member is in default, are, upon due investigation, to report the fact to

the president, who must thereupon declare the member suspended, leaving him his right of appeal to the executive committee; and, as I understand the law, the further benefit of the judgment of the whole body, when the executive committee report the result of their investigation.

The by-law having provided a mode for reviewing and correcting any error or injustice on the part of the committee on membership in reporting to the president that the plaintiff was in default, he was bound to avail himself of the remedy provided by the constitution and by-laws of the body of which he had become a member, before he can ask a court of equity to investigate a proceeding not necessarily final in the body itself, but which was there subject to review, and might be annulled by the action of a committee expressly clothed with authority to investigate it (*Carlen* v. *Drury*, 1 Ves. & B. 154).

He must, in consonance with the rule upon which Lord Eldon acted in the case above cited, resort to the remedy which is provided by the constitution and by-laws of the association itself, before he asks a court of equity to interfere, unless by evasion, intentional delays, or other unjust procedure, he is practically deprived of the benefit of that remedy, which in this case is substantially denied by the answer.

It is averred in the answer that the committee on membership reported the plaintiff to be in default, upon due investigation, and this is all that is required by the by-laws to authorize the suspension of a member by the president. The by-law does not provide how this investigation shall be made, but the law will intend that it means an investigation on the part of the body, in which the member to be affected shall be afforded the opportunity of being heard. What shall or shall not constitute a default upon a contract, so far as it affects the continuance of membership, is a matter which a body like this has the right, in my judgment, to determine for itself; and where it acts in good faith, and the investigation is conducted in the mode provided by the constitution and by-laws, no judicial tribunal would assume the right to reverse and set at naught its decision. As the constitution and by-laws have provided for a standing committee, who are to take cognizance

of and exercise jurisdiction over all claims and matters in difference between members, and whose decision is to be binding upon them, that would seem to be the appropriate tribunal in this body to investigate and decide whether a member is or is not in default, the more especially as provision is made for reviewing and correcting the decision, if erroneous, by an appeal to another tribunal of the board, called the board of appeals. When a claim, therefore, is made by one member upon another, and he brings the matter in difference before this arbitration committee, and they, after having notified the other, and afforded him the opportunity of being heard, investigate the claim, and decide that the other party is in default, that is, in my judgment, a "due investigation" within the meaning of the law. It never could have been the design of the by-law that the committee on membership are also to sit in deliberation upon the matter, and investigate it over again, before they are authorized to report to the president that the member is in default. It is due investigation on their part when they inquire and ascertain that the arbitration committee, whose decision is binding and subject to review, have decided, in a matter legitimately before them, that a member is in default. A second investigation would be superfluous, and was not, in my judgment, contemplated by the by-law.

The plaintiff avers, upon information and belief, that some of the members of the arbitration committee were already prejudiced against him, having repeatedly expressed an opinion favorable to Currie, Martin & Co.; to which ground of complaint there are several answers: In the first place, this allegation is too general and indefinite. The names of the members referred to are not given. It is not known whether they are or not defendants in this suit; so that this allegation is incapable of a specific denial by answer on the part of those who could alone make it; in addition to which, the president, in his answer, denies, so far as he has any knowledge or information, that any member or officer of the board has at any time taken any side or combined or in any manner acted with or at the instigation of Currie, Martin & Co., against or to the prejudice of plaintiff, or *interfered in any way or manner*, ex-

cept so far as the constitution and by-laws required them to.
In the second place, the plaintiff did not, when notified to ap-
pear before the committee, place his objection upon any such
ground, but his written protest against the action of the com-
mittee was put upon the ground that no matters of difference
had arisen between Currie, Martin & Co. and himself; that
that firm had no claim against him of any kind, and that nothing
has arisen under the contract calling for the action of the com-
mittee ; in which he was mistaken ; for a matter in difference
had arisen between him and Currie, Martin & Co., as he and
they differed in their understanding of the contract.  They
acted upon their construction of it, and the result was a claim
by them against him, under it, for a large sum of money,
which claim they brought before the committee, the committee
having, under the constitution, cognizance over all claims be-
tween members ; so that something had arisen calling for the
action of the committee.  And, in the third place, if some of
the committee were, as the plaintiff supposes, prejudiced
against him, and had, before taking any action in the matter,
expressed opinions favorable to Currie, Martin & Co., the ac-
tion of the committee was not final.  The plaintiff could have
appealed from their decision, if it were erroneous or unjust, to
the board of appeals, and he should have resorted to the rem-
edy provided for him within the board, before he could ask a
court of equity to interfere upon the ground that the arbitra-
tion committee were prejudiced against him.

For these reasons I am of opinion that the proceedings upon
the plaintiff's suspension were regular ; that they were in ac-
cordance with the constitution and by-laws; that nothing has
been shown that would authorize this court to interfere, and
that Judge Van Vorst was right in dissolving the injunction at
special term.

Judge Brady concurred.

Judge Barrett, having been of counsel in the cause while at
the bar, took no part in the decision.

Order at special term affirmed.