Van Vorst, J.
The Union Club of the city of New York is a voluntary association, organized and existing under a written constitution for social purposes. The administration of its affairs and its government is confided, by its constitution, to a committee of twenty-four members, known as its governing comma t tee, which holds monthly meetings. The club itself meets annually only, but the governing committee may call special meetings of the club to consider a specific subject (Constitution, Article XI. § 82). This action is brought by the plaintiff against the club, prosecuted through its treasurer, to obtain a judgment of this court declaring the resolution passed by the governing committee on the 25th day of May, 1882, expelling the plaintiff from membership of the club, to be null and void. The governing committee has authority both to admit and expel members.
The objection to the record of the plaintiff’s expulsion, taken on the trial by his learned counsel, will be considered in the order in which they were presented.
The first objection is, in substance, that the plaintiff was not expelled by a two-thirds vote of the governing committee.
The provision of the constitution on the subject is, *4 “ a two-thirds vote of the governing committee expelling or suspending” a member (Article IV. § 3). By Article XII., under the head of “ meeting of the governing committee,” it is provided that a majority of its members (exclusive of those absent by its permission) shall constitute a quorum of the governing committee. If the governing committee was full, at least thirteen, members would be required to be present to constitute a quorum. But as the constitution provides that any member of the governing committee, who should absent himself from three consecutive i regular meetings, without having previously obtained permission to do so from the committee, should cease to be a member of the committee, the number of the committee was liable to be reduced from this cause, as it would also be by resignations. In this view the number of members requisite to constitute a quorum, as it might actually exist from time to time, could not be an absolutely fixed one. At the date of the passage of the resolution by the committee, expelling the plaintiff, the committee had been reduced, through the causes above mentioned, to twenty, three members having resigned during the year and one having been dropped through a failure to attend the meetings.
Two views, directly opposed, are presented by the counsel representing the parties as to the number of votes necessary or sufficient to expel a member. On behalf of the plaintiff, it is urged that it required a vote of two-thirds of a full committee of twenty-four members, or sixteen votes, to expel, and that, notwithstanding the membership of the committee, had, for any cause, been reduced ; on the other hand, the defendant’s counsel contends, that a vote of two-thirds of a quorum of the committee, as it actually existed, whatever might be its number, would be sufficient to carry a resolution of expulsion.
The questions here raised are very important, and, *5 if the plaintiff’s objection be well taken, Ms attempted expulsion is invalid.
The provisions of the constitution, whenever it speaks, must be strictly followed in all proceedings for the expulsion of a member ; and the result sought to be reached through its violation cannot be upheld. But upon consideration*, I do not think that the objection interposed by the learned counsel for the plaintiff, supported, as it is, by a very able argument, should prevail.
The government and management of the club, which included the power to admit and expel members, were committed exclusively to a body of twenty-four members. Yet it is clear, that this, as well as-oilier powers entrusted'to the committee for the preservation of the life, and utility of the club, must-needs be performed by it, although the number of its members might become reduced, and remain so reduced, until the next annual election, as the committee had no power under the constitution to fill vacancies in their number. So that, when the constitution speaks of what the governing committee has power to do, it must mean the committee as it was actually constituted at the time the duty was to be performed As when in article I., § 2, it is said that “ the real estate of the club is vested in trustees, and shall be held or transferred by them, as may be directed by the governing committee.”
There are other illustrations in the constitution of a kindred nature, which tend to show, that although there were vacancies in the body, the remaining members were the governing committee charged with the performance of the duty imposed, and invested with the power conferred.
So that, when in Article IV., entitled 66 the powers of the governing committee,” it is said that such committee is authorized to admit and expel members, “ a *6 two-thirds vote of the governing committee expelling or suspending,” it must mean not a two-thirds vote of a full committee of 24 members, in the event that the membership of a part of the committee had terminated by death, resignation or otherwise, but a two-thirds vote of such proportion of the committee as was authorized to act by the provisions of the constitution: in other words two-thirds of a quorum. And as the governing committee at the time of the passage of the resolution of expulsion was composed of 20 members only, and as 11 members was sufficient t.» constitute a body to transact business, and as the resolution in favor of the plaintiff’s expulsion received the votes of 14 of the 18 members present at the meeting, it was legally adopted.
Conceding that all limitations upon power committed, by the organic law of a body like the Union Club, to a limited number of its members, should b« strictly construed, especially when it is sought to be exercised in the extreme case of the expulsion of a member, still I am persuaded that the construction above given is both reasonable and just.
Such construction is amply sustained by authority, when similar questions have arisen under the constitutions of States. In the case of State v. McBride, 4 Mo. 303; S. C., 29 Am. Dec. 636—where the constitutional provision was, that the general assembly might at any time propose such amendments to the constitution as “ two-thirds of each house” shall deem expedient, and that if at the first session of the general assembly, after a general election, two-thirds of each house shall by yeas and nays ratify such proposed amendments, they should be valid to all intents and purposes, as parts of the constitution,—an objection was made that an amendment had not passed the senate by a majority of two-thirds of that house. The senate consisted of twenty-four members ; seven voted *7 against the amendment and fifteen for it. The constitution provided that “ a majority of each house should constitute a quorum to do business.?’ The amendment was adjudged to have been legally passed, although it had not secured a vote of two-thirds of the twenty-four members, of which the senate was composed.- The court held, that the word “ house,” .as applied to a branch of the legislature, means a number of members sufficient to constitute a quorum to do business, and that an amendment to the constitution, ratified by two-thirds of a “ majority of all the members elected, is ratified by two-thirds of that house.”
In Southworth v. Palmyra, &c. R. R. Co., 2 Mich, 287, it was decided that the word ££ house” in section 2, article 12 of constitution of the State of Michigan, means the members present, there being a quorum, and not a majority of all the members elected, and that “ an act of incorporation, passed by a vote of two-thirds of the members present, there being a quorum, is constitutional.” The constitutional limitation in that case was that “the legislature shall pass no act of incorporation, unless with, the assent of at least two-thirds of each house” And the language of the constitution was that “a majority of each house shall constitute a quorum to do business.” To the same effect is Green v. Weller, 32 Miss. 650; Cooley on Con. Lim. 141, marg. note.
The learned counsel for the plaintiff in Ms brief, quotes from Judge Cooley’s work on “Constitutional Limitations ” a passage in which this sentence occurs : “and where by the constitution a two-thirds or three-fourths vote is made essential to the passage of any particular class of bills, two-thirds or three-fourths of a quorum will be understood, unless the terms employed clearly indicate that this proportion of all the members, or of all those elected, is intended. The intention is to be derived from the language of the *8 constitution itself. In the case under consideration, the “ terms employed” are “a two-thirds vote of the governing committee expelling or suspending,” and a majority of its members (exclusive of those absent by its permission) shall constitute a quorum of the governing committee.” There is no qualification of the term “ governing committee ” in either case. And if the term “ house,” as applied to important legislative, acts, involving even a change in the constitution of a State, means a number of members sufficient to constitute á quorum to do business, by parity of reasoning a two-thirds vote of a quorum of the governing committee is a two-thirds vote of the committee itself.
But the plaintiff’s counsel urges that through a change in its constitution, made in 1876 by the club, it indicated an intention which supports the view taken by him. An attempt to infer an intention, in a particular direction, from a simple change in a law, when the changed law itself furnishes no clue, and there is no contemporaneous writing or act to guide the search, is hazardous.
But the contention merits examination. By the constitution of 1874, the terms of the constitution were “ a two-thirds vote of a meeting, in favor of expulsion, expels.” The constitution then in force also declared that “ a quorum should not be less than thirteen.” That was a majority of a full committee. The terms of the present constitution, already given, show the changes made. A fixed number no longer constitutes a quorum, and a vote of two-thirds of a meeting no longer expels.
If allowed to indulge in inferences, it may be well supposed that a reason for the change in the number sufficient to constitute a quorum of the committee, to transact business, was found in the difficulty of securing'at times the attendance of thirteen members of the *9 committee, especially when its number was reduced during the year by resignations or death, and when a number less than thirteen would constitute a majority of the actual members, and, in such case, that a vote of two-thirds of the “governing committee”—that is, of a quorum thereof—would suffice to expel a member.
But it is further urged that this construction may lead to harsh results, and that a member might at some time be expelled by a very small vote if the governing committee should come to be much reduced by resignation and other causes. The same might be urged with regard to the action of two-tliirds of a quorum of a legislature. Such a limited body might indulge in imprudent legislation, which would not have received the approval of two-thirds of all the members elected. But notwithstanding the reduction in the membership of its governors, the club itself must live and be managed and controlled by the body upon whom the duty is cast.
The discipline of the club, so essential to its welfare and peace, must continue to be enforced under the constitution, and in the way w'hich it directs. This constitution, with all its defects, if it has any, the plaintiff himself assented to when he became a member of the club, and he should be willing to abide its terms, which were self-imposed. The apprehended absurdity or hardship was not present in the case under consideration, for out of the twenty members of the committee, eighteen were present and took part in the proceeding. But the apprehension that a law may lead to harsh results, is no reason why it should not be enforced, nor why a wrong decision should be made.
The second objection taken by the learned counsel for the plaintiff is that the vote of expulsion was illegal and void, because Isaac Townsend, one of the gov *10 ernors, who took part in the proceedings, and voted in fayor of the resolution of expulsion, was related to “Henry Turnbull, who was one of the parties to the controversy, tried by the governing committee that in such case the law presumes bias, and that the relationship not only disqualified Townsend from taking part, but voided the whole proceeding, even though without the vote of Townsend there would have been a sufficient number of affirmative votes to pass the resolution. Such is the substance of the plaintiff’s objection. Mr. Turnbull’s true relation to the proceeding is hereafter fully stated. Townsend, a member of the committee, and who took part in the proceeding, as is mentioned in the plaintiff’s objection, was a cousin of Turnbull’s wife.
The plaintiff’s objection is based upon the ground that the proceeding was a judicial one, or in the nature of a judicial proceeding. If by that is meant that the governing committee were to exercise judgment and sound discretion in considering and deciding the matter before them, the term is well applied. Not only that: they were also called upon, in conducting the investigation, to be impartial and free from prejudice and bias. To secure the sanction of the club, which they represented, in the important matter before them, or the approval of a court of equity, the proceeding must be characterized by honesty and good faith.
But that everything that would disqualify a judge from taking part in the trial or decision of a cause in a legal tribunal, created by the authority of the state and of which it forms a part, would prevent one of the governors from discharging his duty in a case of discipline, arising in his club, cannot be admitted.
The rules of the common law and statutes in this regard apply to trials in courts of justice and the conduct of the judges of such courts, and cannot control *11 proceedings of the nature of the one we are considering, in which a voluntary association of men is dealing with its members, in the interests of the club, under its own laws and methods of procedure.
Besides, this was not, in any true sense, a trial of a matter between the plaintiff and Turnbull, either submitted to, or of which the committee assumed jurisdiction, at the instance of one adversely to the other. The case before the committee was not “ inter partesP The club itself was proceeding against both plaintiff and Turnbull in the way of discipline.
The governing body, unlike the judges of a court, £< ex proprio motuf and acting upon the knowledge of its members or relying upon facts and circumstances brought to its notice, and in the interest of the club, summoned both parties to appear before it, so that an exact statement of facts in relation to the difficulties existing between the plaintiff and Turnbull could be had. It cannot be doubted, from the facts then existing, that the club itself was chiefly concerned, and that the inquiry was initiated for its honor and peace. It might turn out that both persons were blameless, yet in the end it was found that each' was in fault; the one was censured and the other expelled.
In the sense above indicated, the inquiry was in its nature judicial, or quasi-judicial. These terms are applied by courts to inquiries of this character, and properly enough by way of accommodation. But it must be seen that the duty of the governors, as their title implies, and the constitution provides, was largely administrative. They were not set "apart to decide cases of discipline only. They governed the club. In the state, executive and administrative officials are often called upon to exercise authority “ quasi-judicial,” yet neither relationship to persons, nor interest in the subject-matter is a disqualification. Unless the statute under which an executive or administrative *12 officer, upon whom duties “ quasi-judicial ” are also cast, holds his position, disqualifies him for interest or relationship to subject or persons, he must act, not- > withstanding the maxims and rules of law. The statute is paramount.
And where a statute disqualifies a judge for the same causes, from hearing a case, the statute must yield to a constitutional provision directing him exclusively to hear a class of cases. Thus, in Matter of Leefe, 2 Barb. Ch. 39, it was held that when the constitution had given to parties an appeál to the chancellor from all inferior equity tribunals, and there was no statutory provision authorizing any other person to sit for him in a case where he is related to one of the-parties, the chancellor is bound to hear the appeal, even when a near relative is a party. That the provisions of the statute prohibiting any judge from sitting, when he is related to either of the parties, is controlled by the constitution, as a paramount law.
It,was stated in the case above mentioned, by Chancellor Walworth, that" Chancellor Kent took jurisdiction of and heard a litigated case, in which his brother was one of the parties and personally interested. That was the case of Mooers v. White, 6 Johns. Ch. 360.
It is a maxim of the common law that “no man can be a judge in his own cause.” Tet assessors, quasi-judicial officers, have a voice in fixing the valuation of their own land, and members of boards of supervisors and town auditors pass upon their own accounts. The necessity of the case demands'it.
In the Matter of the Southern Boulevard, 3 Abb. Pr. N. S. 447, it was distinctly held that a commis- . sioner appointed by a special statute to award damages for property taken in laying out a highway is a “quasi-judicial officer” only, and is not within the application of the maxim precluding a person from acting as a judge in his own case ; that the maxim *13 applies to judicial officers, and not to officers whose duties are only “quasi-judicial.”
The case of Baldwin v. Calkin, 10 Wend. 167, was decided by Chief Justice Savage. It has been repeatedly cited. That case decides that when a power is granted by the. statute affecting the property of individuals, and conferring upon the judges of a county court, the power of assessing damages of individuals in consequence of a public improvement, but requiring that such judges should not be interested, the statute must be strictly pursued, and it must in general appear on the face of the proceeding that it has been so pursued, yet, when a party affected by such assessment had notice of the application to the judges who performed the duty assigned, appeared before them, contested the claim set up, and did not object to the proceeding on the ground of interest of the judges, he was deemed to have waived the objection, although the fact was not averred that the judges were disinterested (Paige v. Fazackerly, 36 Barb. 392-397, by Hogeboojvi, J., citing Baldwin v. Calkin [above]; Matter of Ryers, 72 N. Y. 1, 15).
The learned counsel for the plaintiff has called the attention of the court to Edwards v. Russell, 21 Wend. 63, and Oakley v. Aspinwall, 3 N. Y. 547, and other cases to show that the act of a judge of a court of law or equity, in sitting in a case in which he is interested, or in which he would be excluded from sitting as a judge by reason of consanguinity or affinity to either of the parties, would be nugatory and void, and that the judgment would be vacated. The statute forbids him to sit under such circumstances, and that he should sit, is shocking to common sense, and to our sentiment of justice. But as has been shown above, in cases of necessity, the statute has not controlled, and the rule of law has been violated even in courts oi justice; and further, that neither the statute nqr *14 rule of law applies to “ quasi-judicial officers ” created by statute.
It must follow that neither the statute, nor principle, nor rule of law upon which it is founded, controls the proceedings of a governing committee of a voluntary association, while engaged in the exercise of its discipline under its constitution and laws, and that the resolution of expulson is not void, for the reason that Mr. Townsend was related to Mr. Turnbull as stated, took part in the investigation, and voted upon its passage. Being one of the governing committee, his justification for taking part in the meeting at which the resolution of expulsion was passed, if a justification is needed, is found in the duty imposed by the constitution upon the committee exclusively to admit and expel members.
It is, however, suggested that the relationship of Mr. Townsend to Mr. Turnbull implies the existence of bias in favor of the latter. But the partiality or bias of one member of a committee, if it in fact existed, would not of itself impeach a resolution of expulsion, passed by a vote sufficient, exclusive of the one concerning which a question was made. The subject of bias of the whole committee is subsequently considered.
The third objection taken by the plaintiff’s counsel is, that the meeting of the governing committee, at which the resolution of expulsion was adopted, was not legally organized, for the reason that Benjamin H. Bristow, who, as it is claimed, was a member of the governing committee, was not notified of the meeting, and did not attend.
The meeting of the 25th day of May was a special one, and its proceedings, in so far as they affect the plaintiff, can only be regarded as valid upon its appearing that all were notified or attended. The ruling in Smyth v. Darley, 2 H. L. Cas. 789, and People v. *15 Batchelder, 22 N. Y. 125, in principle apply to this case. In fact, it requires no reference to any reported, case to fortify such conclusion, which is in itself reasonable and just.
The question then arises, was Mr. Bristow a member of the committee on the day the resolution of expulsion was passed? Under the evidence, Mr. Bristow was chosen at the annual election of the club, which took place on the 24th day of May, to fill a vacancy occasioned by the dropping of a member of the governing committee, Mr. Evarts, who, on account of his absence from three consecutive regular meetings of the committee, had ceased to be a member.
The learned counsel for the plaintiff urges that the moment of Mr. Bristow’s election to take the place of Mr. Evarts, he became ipso facto a member of the committee in his place. Mr. Evarts was chosen to be one of the governors at the annual meeting, held on the 25th day of May, 1881, to hold office for three years from the 8th of June, 1881. His term, therefore, would not have expired until the 8th day of June, 1884, but he ceased to be a member on the 1st day of December, 1881.
By the constitution of the club, the governing committee is divided into three equal classes, the term of the oldest class expiring on the second Wednesday of each June, or when their successors are elected. “ Members to replace the outgoing class, and to fill vacancies in the other classes, shall be elected by the club at the annual election.” On the 24th day of May, 1882, the annual election was held. The call for the election stated that it would be held to fill the places of such of the members whose term of office would expire on the second Wednesday of June, and also to fill vacancies of three persons who had resigned, and whose term would also expire at the time above mentioned, and also to fill a vacancy in the place of *16 Mr. Evarts, whose term would expire on the second Wednesday in June, 1884. At' the election held on the 24th day of May, 1882, two tickets were voted, by a form of ballot, which nominated eight persons for members of the governing committee, to serve i'or three years from the second Wednesday of June, 1882, and one person to serve for two years from the second Wednesday of June, 1882. The latter evidently, although not so stated, to elect a person to take the place of Mr. Evarts. The inspectors of election certified to the number of votes cast for the persons nominated, and declared the result. Eight were elected for the term of three years from the second Wednesday of June, 1882. They also certify that Mr. Bristow was elected for the term of two years from the second Wednesday of June, 1882. The secretary sent a notice to Mr. Bristow, that he was elected a member of the committee to serve for two years from the second Wednesday of June, 1882.
In determining when Mr. Bristow’s, term of office-was to commence and end, if his election was a valid one, we are concluded by the form of the ballots cast; they reflect the intention of the voters. The certificate of election made by the inspectors may be questioned and impeached. But if extrinsic evidence is to be received, it must be as to the intention of voters. The intention of the voter, however, is derived from the terms of the ballot cast by him. We cannot give a meaning to a ballot hostile to that which is expressed on its face (People v. Seaman, 5 Denio, 409, 412).
The ballots cast in favor of Mr. Bristow were not to fill the vacancy of Mr. Evarts, as it then existed, but for a part of that vacancy—that is, from the second Wednesday of June, 1882. Had the ballots cast been simply “ to fill the place of Mr. Evarts,” or equivalent words, the result would have been that Mr. Bristow would have been entitled to his seat at once.
*17 It is true that the constitution provides that e‘ members to replace the outgoing class, and to Jill vacancies in the other classes, shall be elected by the club at the annual election.” And it was competent for the voters to have filled the whole vacancy, commencing with the day of the election. But it is evident that they neither did, nor intended to do, otherwise than their ballots expressed.
The court cannot make a ballot for the voters in opposition to that which they cast, nor can it enforce upon them a choice as to the term which they did not make. If by a limitation affixed to a ballot by a voter it is defective in substance, it should be rejected.
It is possible that the voters made a mistake in qualifying their ballots as they did ; upon the trial I suggested that the words might be regarded as surplusage. But upon reflection I do not think that I can reject the qualification. And if Mr. Bristow’s term was not of the character or quality indicated by the ballots and the certificate of the inspectors, then he was not chosen at all; and had he been present at the meeting of the 25th of May, it might have constituted a good objection to the validity of the proceedings.
I do not regard the case of People v. McKinney, 41 Barb. 515, upon its facts, as an authority in support of the contention of the plaintiff’s counsel. In that case there was a vacancy in the office of school commissioner, which was authorized to be filled at a general election. There was nothing said in the notice issued for the election, showing that it was to fill a vacancy. McKinney was elected and immediately entered upon his office. It was held that he was entitled to hold office during the entire term for which the person whose resignation had caused the vacancy was elected, and that his term commenced at the date of his election. The ballot voted was indorsed simply *18 “ school commissioner ” without any qualification whatever. The real point at issue in the case was, not when McKinney’s term began, but whether he was elected for a full term of three years, instead of to fill a vacancy. The ballots were in the form mentioned by statute, which is the same in all cases, whether for a full term or a vacancy. Had the ballots been in a form materially different from that directed by the statute, they would probably have been in the first instance regarded as defective.
I have said above that the certificate of the inspectors, declaring the term of Mr. Bristow, was not absolutely conclusive. It was in that light that I discussed the question, and with a view of ascertaining whether any injustice was done to the plaintiff through a failure to notify Mr. Bristow of the special meeting of the 25th day of May. But it appears to me to be clear that the certificate of the inspector's could only be impeached directly, through a claim of Mr. Bristow for the place, in opposition to its terms, and not collaterally. It does not appear that Mr, Bristow ever asserted any claim to his seat before the second Wednesday of June, nor but that he acquiesced in the result declared.
For the reasons above expressed, I must decide that the plaintiff’s third objection is groundless.
The fourth objection raised by the learned counsel for the plaintiff is in substance that the plaintiff has not been fully and fairly heard according to the principles of natural justice, but that on the contrary he had no trial at all.
Several distinct grounds are stated to sustain this general objection. They are substantially:
That no charge was ever preferred against the plaintiff, and that he was not notified by the governing committee that the question of his expulsion was under consideration, or that the ex parte inquiry con- *19 earning the quarrel between himself and Turnbull might have any such result. That the report of the sub-committee, upon which he was expelled, contained the testimony on material facts of the case, of three witnesses, wdio were all examined behind his back, whom he was not permitted to confront or cross-examine, and whose testimony was now made known to him. That he was not permitted the aid and assistance of counsel at any stage of the proceeding, and that some members of the governing committee who took an active part in the proceeding were affected with actual bias, and were disqualified to act.
This further objection, with its specifications, presents the most difficult questions in this case, and is entitled to the most careful consideration.
The question is not,.however, whether the proceedings from beginning to end might not have been conducted differently and more in conformity with those which obtain in the courts of the state, which are regulated by statute and fixed by rules, but whether or not the principles of natural justice have been violated in withholding from the plaintiff a fair and impartial hearing before the passage of the resolution for his expulsion.
Neither the constitution nor the rules of the club furnish any guide for the method of conducting investigations like the one under consideration. They make no provision for notice to or the summoning of parties, nor as to the manner in which the facts should be elicited.
What would be necessary to be done in one association, with fixed rules of procedure, in respect to formulating and serving specific charges upon an accused member, or as to the summoning of the body of associates, when the charges were to be considered by it, and a notification to the members themselves of the specific matter to be considered, and which would *20 involve a summons of the accused himself to be present when the matter was to be taken up and decided, would clearly not be required in another association having no such rules.
Thus in Dawkins v. Antrobus, 17 Ch. Div. 615, and other cases cited below, upon the refusal of an accused member to resign when called upon to do so, after an investigation as to his conduct had been had, the rules provided that it was the duty of the committee who had conducted the inquiry to call a general meeting of the club itself to determine the principal question, at which the accused could of right be present. And an omission to properly notify him of the proposed meeting and its specific purpose, or a material defect in the call of the meeting, or in summoning members, would invalidate the proceedings. But the constitution and rules of the Union Club contain no such directions and involve no such practice. The entire matter, not only of investigating, but also of finally deciding, rests with the governing committee, and of necessity under such rules, as it may approve.
The facts herein tending to show the conduct of a member “improper and prejudicial to the club,” must be presented to or be collected by the committee in some way, but it should be in a reasonable and fair way, and no member could be properly expelled without notice that his conduct was to be investigated, and an opportunity given him to be heard, before his expulsion.
This is the first case in this State in which a court of equity has been called upon to determine the principles or methods of governing, or to be employed by a purely social club in conducting investigations as to the conduct of a member leading to his expulsion. The jurisdiction of the court is not disputed. Membership in the club in question is regarded as a valuable social privilege, and an unjust expulsion as a *21 stigma upon character, to be redressed in a court of equity.
Cases have arisen in this State in respect to expulsions from benevolent societies, the Stock Exchange and other associations, involving rights of property, and principles have been announced which apply to this case. Thus in the case of Wachtel v. Widows’ and Orphans’ Society (84 N. Y. 28), it is stated by Darfo rth, J.: “It is well settled that an association whose members become entitled to privileges or rights of property therein, cannot exercise its proper power of expulsion without notice to the person charged, or without giving him an opportunity to be heard.” In that case no notice had been given.
But several cases have arisen in the English court of chancery growing out of the expulsion of members from social clubs, in which no question of property rights was presented or considered (Hopkinson v. Marquis of Exeter, L. R. 5 Eq. 63 ; Gardner v. Free-mantle, 19 W. R. 256). Both of these cases were before Lord Romilly. In each of these cases the court found no occasion to interfere with the action of the club in expelling a member. In the latter case Lord Romilly said: “1 point out that these clubs are formed entirely for social purposes, and there must be some paramount authority to keep up their objects. In some cases the court will interfere with the exercise of that paramount authority, but only where there is moral culpability, or if the decision is arrived at from fraud, personal hostility, or bias. But in cases of this description, all that this court requires is to know that the persons who were summoned really exercised their judgment honestly. The court will not decide whether they did rightly or wrongly.”
To the same effect is Lyttleton v. Blackburn, 45 L. J. N. S. 219 ; S. C., 33 L. T. N. S. 642. In the cases of Fisher v. Keane, L. R. 11 Ch. Div. 353, and La *22 bouchere v. Earl of Wharncliffe, 13 Ch. Div. 346, before Jessel, the master of the rolls, the record of the expulsion of a member from his club was set aside, and he was restored to membership. In the first of these cases the master of the rolls, after stating that the committee of the club had net all the facts before them, nor the palliating circumstances of the plaintiff’s conduct, added: “But, be that as it may, in my opinion, a committee acting under such a rule as this are bound to act, as Lord Hatherly said, according to the ordinary principles of justice, and are not to convict a man of a gross offense, which shall warrant his expulsion from the club, without fair, adequate and sufficient notice, and an opportunity of meeting the accusations brought against him.”
The case of Dawkins v. Antrobus (17 Ch. Div. 615), contains a satisfactory general statement of the causes and reasons for which a court of equity should take cognizance of cases of this character,' and to what extent the inquiry should go. The case was heard in the appellate court upon an appeal from a judgment of the master of the rolls. James, L. J., said: “We have no right to sit as a court of appeal upon the decision of the members of a club duly assembled. All we have to consider is, whether the notice was or was not given according to the proper rule, whether the meeting was properly convened, and whether the meeting, if properly convened, had come to the conclusion that this gentleman ought to be expelled, having before it the facts; that the committee had, upon investigation of the matter, come to the conclusion, and expressed the opinion, that his conduct was such as to entitle them to call upon him to resign.”
A distinct feature in that case, not present in the one under consideration was, that before a member could be expelled, the committee, who investigated his conduct was empowered to recommend him to re *23 sign. Brett, L. J., in the same case said : “ I think we ought to take great care that this court does not, by sudcessive decisions, usurp an authority in these cases for which there is no color in point of law. In my opinion there is some danger that the courts will undertake to act as courts of appeal against the decisions of members of clubs, whereas the court has no right or authority whatever to sit in appeal upon them at all.” And this learned justice limits the right of the court to inquire, to the question, whether the members of the club have acted “ ultra vires ” or not, and whether anything has been done “contrary to natural justice,” or whether the decision of the club has been tona fide or not, and he adds “that there would be a denial of natural justice, if a decision was come to without the member proceeded against having an opportunity of being heard.”
Mr. Choate is clearly right, both upon principle and authority, in insisting that “before the plaintiff 'could be legally expelled from the club, the governing committee were bound to give him a trial conforming to the principles of natural justice.” Instead of the word trial, however, I would substitute, what I regard as the more appropriate word, sanctioned by the courts, “ hearing.”
It is a maxim of the law, and in accord with our idea of natural justice “that no man shall be condemned unheard.” He should not be condemned without having had an ample opportunity for statement and explanation, when his conduct is a subject of investigation and judgment. This rule obtains as well in social life, as in all organizations of men, whether public or private. It becomes, therefore., necessary to examine their proceedings, to ascertain, what, if any, principle of natural justice has been violated by the committee in adopting the resolution expelling the plaintiff, and this will involve the question *24 as to whether or not he had sufficient notice of the proceedings and an opportunity to be heard. In determining these questions a statement of facts concerning which there can be no dispute, is necessary.
On November 28,1881, the plaintiff in the rooms of • the club, in a conversation with Mr. Turnbull, and two other gentlemen, all of whom were members of the club, .made use of coarse expressions concerning a lady. So unfit was the language to be seen or read, that in his testimony taken before the special committed, a blank is left for the precise words used, nor do they appear at all in the proceedings. The precise words, however, must have been given to the committee, for in their report' they say that the plaintiff “made use of certain expressions regarding a lady, which the committee does not repeat, but which appear fully in the evidence.” The expressions. of the plaintiff greatly excited Turnbull, who upon the instant, used strong language condemnatory of plaintiff,. or of his speech. There is a difference in the testimony taken before the committee, as to the precise words used by Turnbull. According to the plaintiff’s own statement, T-nrnbull said: “ Nobody but a Frenchman could make such a remark ; it is the most ungentlemanly remark I ever heard.”
Shortly after this occurrence plaintiff left for California, and during 1ns absence the matter appears to have been discussed by Turnbull, with other members of the club, and he is accredited with having denounced the plaintiff as a “blackguard.” Plaintiff himself in his statement says: “I received at San Francisco a letter from a friend informing me that New York was very much excited, on account of my having insulted a lady and that it was reported that Mr. Turnbull had called me a dirty, low blackguard.” Upon his return from California in May, 1882, plaintiff wrote a letter to Turnbull dated the 7th of the month, *25 in which he said that it had been reported to him, that he, Turnbull, had stated to C. R. Robert, that his reply to plaintiff, to the remarks he made in the club, on the 28th day of November was in these words that “ any man who used such an expression in regard to a lady was a dirty, low blackguard, and must never speak to him again.” The plaintiff in his letter then continued, “I now write to tell you that you lied when you made the above statement, and that you lied knowingly and maliciously. I further notify you that I am going to give a similar publicity to this letter, that you did to the lying statement, you so industriously circulated during my absence.”
This was followed by a letter from Turnbull, in which, referring to plaintiff’s note, he says: “Its contents continued to me the estimate which I formed of you on the occasion to which you refer, which I expressed to you at the time, and of which I do not now retract one single word.” In the end Messrs. "Willing and Kimball, the other gentleman present at the occurrence on the 28th of November, were written to by the parties to ascertain their recollection of the reply made by Turnbull to the remarks of the plaintiff.
Mr. Willing says that Turnbull’s expression was “ that it was the most blackguard expression and ungentlemanlike thing he had ever heard a man use in reference to such a subject.” Kimball’s recollection was in substance the same.
In the end, Turnbull caused to be printed, and distributed among the members of the club, a circular, giving his version of the occurrence of the 28th of November, to which was appended the subsequent correspondence between himself and plaintiff, and the letters of Messrs. Willing and Kimball. The matter thus became a further svibject for discussion in the club, and found its way in the city newspapers. That it was now the duty of the club itself, for the preser *26 vation of its honor, to take appropriate action no one can doubt. The president directed the secretary to call a special meeting of the governing committee to ascertain its sense as to the propriety of investigating the matter. To the reply of the secretary that their might be danger of the names of innocent parties being dragged iip the president answered : “ The publication has already been made in the newspapers, and no more harm could be done by it, and he would not consent to remain as president of the club, if it should allow such occurrences to take place within the walls of the club, without the governing committee faking notice of it.” By the direction of the president a special meeting of the governors was called for the 17th day of May, at which time seventeen members of the committee were present. The president stated that the object of the meeting was to obtain the sense of the committee as to the propriety of the club investigating the recent difficulties which had taken place between two members of the club, the plaintiff and Mr. Turnbull. After remarks by various members of the committee, a resolution was unanimously adopted as follows : “ Resolved, that a committee of five be appointed by the president to investigate and report to the governing committee, at a future meeting to be called by the president, an exact statement of facts in relation to the difficulties existing between Messrs. J. F. Loubat and Henry Turnbull, with instructions to inform Mr. Loubat and Mr. Turnbull of the resolution, and giving them an opportunity to appear before them.”
Such committee was appointed, and its chairman, on the 18th of May, enclosed to the plaintiff a copy of the resolution of the governing committee, and notified him in writing that the committee would be glad to receive from him a statement of the facts, and requested him to appear before them on the 19th day of *27 May at 4 (/clock P. M. Mr. Turnbull was served with a similar request and notice.
After receiving the notification from the committee, plaintiff, in pursuance of an appointment made, called at the office of Mr. Platt, a member of the club, and who was a counsellor-at-law, and whose law firm had been consulted on some previous occasion professionally by plaintiff. He showed to Mr. Platt the notification he had, received from the committee, and then proceeded to draft a statement of his case, which Mr. Platt read and approved. Mr. Platt made an appointment to meet the plaintiff at the club house that afternoon, which was the day of the meeting of the committee.
The special committee convened at the club house at the time fixed in the notification to the parties. The plaintiff, accompanied by Mr. Platt, appeared before the committee. The plaintiff at the suggestion of Mr. Platt, read the written statement of facts which he had prepared, and was orally examined by the committee in the presence of Mr. Platt. Before the plaintiff made his appearance, Mr. Turnbull had made his statement to the committee. Messrs. Willing and Kimball, who had also been summoned, by the committee, appeared and gave their statements, at the same meeting of the committee. The plaintiff was not present during the examination of either Turnbull, Kimball or Willing, nor does it appear that he was asked to be present, otherwise than through the notice served upon him. Mr. Sheldon, the chairman of the committee, however, testified on the trial, “ that he could have been present if he had asked to be.”
Mr. Platt testified that he was' present only as the friend of the plaintiff. But the chairman of the committee testified, that plaintiff asked to have counsel present, and that the request was granted on the con *28 dition that the counsel should be a member of the club, and that Mr. Platt was accordingly admitted. ■
Mr. Cadwalader, a member of the committee, and who is himself a lawyer, testified that plaintiff “said he desired to be represented by counsel j a question arose, and he was asked, if his counsel, or the party to represent him, was a member, of the club, he said he was, he was Judge Platt; the committee then assented to it.” Mr. Cadwalader further testified that Mr. Sheldon, the chairman of the committee, said : “That the committee was appointed to take the evidence in the case, according to the notice that had been sent to him, and with that he moved forward and handed in himself or by Judge Platt his written statement.”
After the proceedings before this committee of investigation were ended, a special meeting of the governing committee itself, called by the president,, was held on the 25th day of May, eighteen members were present. The special committee submitted their report in writing upon the subject referred to them, accompanied by the evidence. The committee reported facts only, without giving any opinion, or making any recom mendation.
In closing their report the committee says in substance : That the original expressions attributed to the plaintiff, which gave rise to the controversy, are admitted. That while the parties differ somewhat as to the precise words used by Turnbull in reply to plaintiff’s remarks, the “main difference” seems to be whether the objectionable expressions of Turnbull were applied to plaintiff personally or to his remarks. That plaintiff on his return had offered reparation, and had apologized to the parties directly interested, but that he gave rise to a “new controversy” by giving publicity to his letter to Turnbull, who on his part had given new life to the whole matter by alluding to it in plaintiff’s absence, and by a publication and wide *29 circulation of the entire correspondence had brought the original remarks, the quarrel, the parties affected, and the club, prominently and objectionably before the general public.
The report of the sub-committee and the entire evidence taken were read before all the members of the committee present. It was accepted, and after debate a preamble and resolution, proposed by Mr. Blagden and seconded by Mr. Townsend, was adopted in these words : “Whereas, upon the report of the
committee and the evidence adduced, it appears that J. F. Loubat has been guilty of conduct improper and prejudicial to the club : Hesolved, that he be expelled from membership of the club.” The vote was taken by ballot, 14 members voting in favor of the resolution and 4 against it.
A resolution was also adopted unanimously censuring Mr. Turnbull for “having printed, published and industriously circulated the correspondence in question through the medium of the club, thereby bringing the parties immediately interested, the original remark, and the club, most objectionably before the public.”
This resume of the proceedings shows not only what the committee did, but what it omitted to do. Does it sustain the objections of the plaintiff’s counsel under this head? Was plaintiff, in fact, expelled without notice and without an opportunity to be heard; without knowledge of the precise .charges pending against him, or that they might end in his expulsion ?
The only purpose of the inquiry, under the constitution of the club, was to enforce its powers of discipline ; without such object in view the interference of the committee would have been impertinent. The meeting of the governors specially called, the passage of the resolution of inquiry and the notice from the *30 sub-committee, in themselves a charge and a warning, called the plaintiff’s attention directly to the particular subject of investigation, already widely known in the club, and in which he was the chief actor, and with the details of which he was furnished.
The plaintiff clearly understood the purpose of the resolution, for he obeyed the summons, and submitted a carefully prepared statement of his version of the facts. And not only that, for he added to his statement, what he had said to Mr. King, “ that this was not a club matter, but a private matter between Mr. Turnbull and myself, and that the club had nothing to do with it.” The committee was, therefore, advised of the plaintiff’s conclusion in that regard. But in such deduction he was clearly in error. At least the committee so determined, and it was for them to decide whether or not the plaintiff’s conduct, as shown by the facts, was “improper and prejudicial” to the club. That he knew, or had good reason to know, the nature of the charges pending against him, which had invoked the action of the committee, although not distinctly formulated, and the particular subject, in respect to which his conduct was considered blamable, his own written statement shows, for it contains an admission of the principal fact, out of which the whole difficulty originated, and his subsequent action. Was not the fullest opportunity accorded to him, not only to know the subject which had called the governing committee together, but was he not asked to give the facts \ What more could he demand, or what, in addition, did justice require ?
It was after all upon the facts that the judgment of the committee must rest.
It is, however, urged that he had no opportunity to be present at the examination of the witnesses, or to cross-examine them. But he had a counsel learned in the law, a member of the club, and familiar with its *31 rules and usages, and who was accustomed to judicial investigation, who had seen the notice from the committee, and had approved the plaintiff’s written statement, and was present at his oral examination, and, if at all needful for the plaintiff’s case, wiry did he not demand the right, if there was a right, to be present, or to inspect the testimony of witnesses, and to cross-examine them ? No such right was either demanded or refused,-and had it been asked, as Mr. Sheldon, the . chairman of the committee testified, it would have been granted. That such right or permission was not interposed at the proper time, tends to show that it was not considered necessary for the plaintiff’s case.
And the question naturally occurs here, could any cross-examination of either, Turnbull, Willing, or Kimball have taken from the record, or destroyed the force of the plaintiff’s own admission, as to the words spoken by him in the club room, and out of which the whole difficulty arose, and his subsequent conduct, in publishing his letter of the 7th of May, and opening a new “ controversy % ” But it may be urged that a cross-examination might perhaps have shown that Turnbull, and the other gentlemen were mistaken as to the precise words used by Turnbull.
But the important question is, not so much as to the exact form in which Turnbull communicated his rebuke, as it is, whether or not the plaintiff said, wrote and published anything “ improper and prejudicial to the club.” According to the plaintiff’s own showing the words of Turnbull on the 28th of November were “ It is the most ungeutlemanly remark I have ever heard.” It is true that Willing testified that Turnbull applied a stronger term, in denunciation of the plaintiff’s speech and that both Turnbull and Kim-ball say that the stronger term was applied to plaintiff personally.
But the words used by the plaintiff concerning a *32 lady spoke for themselves. Their true character could not be changed by anything either of the hearers may have said of them, and it is idle to discuss whether it makes any difference whether what Turnbull said applied to the plaintiff personally or to his speech.
But it has been urged that the plaintiff has not been informed, and does not even now know, as to whether he was condemned for what he said in the club house or for his subsequent conduct.
Upon his examination before the committee he admitted that he wrote and circulated the letter to Turnbull of May 7th, which, as the committee says, “gave rise to a new controversy.” The committee had before it the plaintiff’s entire conduct from first to last, and in their report the sub-committee speaks first of the plaintiff’s expressions, which gave rise to the controversy, and then of a “ new controversy,” which followed upon his publication of his letter to Turn-bull. Nothing can be added to what the cpmmittee say upon this subject in the third and fourth subdivisions of their summary of the facts- at the close of their report.
It is not for me to say that either of these acts were insufficient to justify the final action of the committee. It was a matter exclusively for the governing body to decide. It has been repeatedly adjudged that such decisions cannot be reviewed by a legal or equitable tribunal, nor even considered, unless the alleged cause of expulsion be so trivial or unimportant of itself, as to suggest that the action of the committee was capricious or corrupt, and not bona fide. The question was one of moral conduct in a social club, and. this court should not adopt a lower standard of morals than that selected by the governors of the club as essential to its life and welfare.
But it is urged that the plaintiff was not summoned before the governing committee itself, and had no *33 opportunity to appear before it or to see the report of the sub-committee before final action was had.
Now, conceding that in a case where the facts have been collected by a sub-committee, who afterwards reported to the governing committee, with whom the decision rested, that it would have been proper and considerate to notify the person proceeded against of the time when the report would be presented and considered, does the omission to take such steps nullify this proceeding ? I think not, under the circumstances of this case.
A general requisite to the regularity and justice of such a proceeding, as already stated, is, that the person shall have notice and an opportunity to be heard. The proceeding was pending'before the governing body itself, so the resolution stated, and did it not provide for notice, and was it not acted upon ? It cannot be •well argued that it- was not in accord with justice and fairness, that the facts should be collected by a subcommittee, before whom the person charged had a right to appear, and produce his facts, which, he was advised would be reported to the governing body. A submission of his case to the sub-committee, his counsel being present, was a submission to the governing body. It nowhere appears, nor has it been contended, that any fact essential to the plaintiff’s case, was not presented to or considered by the committee. The “circular,” containing Turnbull’s version, and the entire correspondence, not essentially changed by the oral statement, was before the committee, and to this correspondence, and the letter of Willingin particular, plaintiff’s attention was called by the committee. Then and there, was the time for the plaintiff to speak and to explain, to justify, or to palliate.
In Fisher v. Keane (abooe), the action of a club was condemned, because a committee of “ English gentlemen,” had taken upon themselves “ to decide ex parte, *34 without notice to the member accused, and without hearing all the circumstances of the case.” The master of the rolls points out that at the time of the meeting of the committee it had not all the facts and circumstances before it which tended to excuse or palliate the conduct of the accused member. But no such element,' so far as I can discover, is claimed to exist in this case. The palliating circumstance that the plaintiff had apologized to the lady was before the governing committee, but that evidently was not considered as a condonatioh of conduct injurious to the club itself.
I have carefully considered the decision of Mr. Justice Lawrence, in the case of Hutchinson v. Lawrence, 67 How. Pr. 88, made on a motion for the continuance of an injunction.' The learned justice toward the close of an elaborate and able opinion, states that “the principle to be deduced from all the cases is, that in every proceeding before a club, society or association having for its object the expulsion of a member, the member is entitled to be fully and fairly informed of the charge, and to be fully and fairly heard.” In that case the plaintiff had himself asked an investigation by the governing committee of the stock exchange of rumors affecting his reputation for integrity in his dealings with one Duff. In that case, as in this, an investigating committee was appointed,before whom the parties, and their witnesses appeared, and the-special committee reported to the governing committee, and the report was accepted. Charges were then, in pursuance of an article of the constitution of the stock exchange, preferred against the plaintiff, and he was notified to appear and answer the charges. Plaintiff appeared before the governing committee, and submitted his answer and defense. At this stage of the proceeding, as Mr. Justice Lawrence says: “Hutchinson, from the proceedings which had taken place, was justified in the conclusion, that the investí *35 gation before the governing committee, so far as it related to the taking of evidence, was closed, and that ■ he had been heard upon the evidence as it stood.” But Buff and the persons whose testimony had been taken before the investigating committee, and had been reported to the governing committee, were called before the governors, to satisfy the doubt of some members, and gave testimony upon material points in the absence of Hutchinson, and without notice to him, and which, as the judge said, “must have had great effect upon the members of the governing committee, who had before been in doubt, and that Hutchinson had never cross-examined Duff in relation to those- matters.”
The point upon which the case turned before Justice Lawrence, is not involved in the one under consideration. The governing committee of the Union club, acted upon the report of the select committee, “and the evidence adduced before it.” Had the governing committee received further evidence, after the submission to it of the report of the select committee, under its resolution wdthout notice to plaintiff, or an opportunity to answer it, this case would have been within the ruling of Hutchinson v. Lawrence.
The permission given to the plaintiff by the committee, to be represented by counsel, cannot be looked upon otherwise than as showing its entire willingness that he should have a fair hearing, with every advantage that those terms imply. The limitation imposed by the committee that the counsel should be a member of the club, in itself proper, did not fetter or embarrass him, but enabled him to introduce the very counsel he had himself chosen, and who was not only a good lawyer, but a personal friend.
Mr. Platt, however, testified upon the trial that when he entered the committee room with the plaintiff, Mr. Sheldon, the chairman, said to him, “ You are *36 not here to make any remarks.” If that was said by Mr. Sheldon, it was entirely inconsistent with the permission already given, and is in itself improbable. Why have counsel if his lips were sealed % There were two lawyers on that committee who knew n,ot only the privilege but the duty of counsel in such a proceeding, where the inquiry was for facts, and who were justified in concluding that the counsel would assert the one and perform th»e other; that he was there not only to observe, but, when necessary, to speak and act.
The evidence shows that Mr. Platt was entirely mistaken in putting such words in Mr. Sheldon’s mouth. Mr. Cadwalader denies the use of such words, and testified, on the other hand, that nothing was said to prevent Mr. Platt representing the plaintiff, or from making any statement on his behalf. Mr. Sheldon also testified that nothing of the kind testified to by Mr. Platt occurred, and that not the slightest obstacle was in any manner interposed to his making any statement he might choose. The plaintiff, who was present during the trial, was not called either to sustain Mr. Platt or to show any word or act of unfairness on the part of the committee toward him in this or in any other regard.
What then becomes of the objection that the plaintiff was not allowed counsel to stand by him during the investigation, and to advise him as to his rights, and to enforce them ?
The committee was then in session to receive the .evidence; the persons chiefly concerned, as well as the witnesses, were in the club house ; the occasion .was open to the plaintiff and his counsel', and had they desired to listen to the evidence, or to read it, or to cross-examine witnesses, there is not the slightest reason to doubt but that this request would have been ■granted. Is a party and his counsel to remain silent *37 when it is their duty to speak 2 And can they after-wards, with justice, be allowed to say that a right, which was not demanded, had been refused or withheld 2 Had the plaintiff desired for any purpose to see this evidence before it was reported to the governing committee, by whom it was to be considered, as he was advised by the resolution itself, he had ample time to do so before the meeting of the 2oth day of May, when it was submitted.
In bringing to a close my examination of this portion of the plaintiff’s case, I am constrained to say that, notwithstanding the force and earnestness of Mr. Choate’s contention, which I have attentively considered, it cannot prevail with me. For I cannot conclude that in the com mil tee’s method of procedure, which, as far as any precedent extended, was in harmony with the usages of the club, any real injustice was done to plaintiff. It is true that the committee did not notify him that the investigation might result in his expulsion. No such explicit notice could have been given in advance, as it could not be known until the facts were developed what judgment would follow.
And any member of the club summoned to appear before the proper authorities to give a statement of facts in regard to a transaction of the nature of the one under consideration in this case, and so affecting his relations to the club and his associates, must be prepared for such judgment upon his conduct as the facts will justify, although they lead to his expulsion. And the general statement may be made with respect to the action of the governors of this club, and of other associations, in which a power of so much importance is intrusted to the hands of a small number, that it would scarcely be possible to administer discipline where there are no fixed rules of procedure, or to conduct the same so as not to encounter objections that
*38 >—_______ such a step was not taken and such a form was not observed.
But neither this nor that omitted step or form, could invalidate the judgment of the governing body acting quasi-judicial, unless it could be seen that injustice had been done. For so long as the principle of justice, in letter and spirit, is respected, and the party has been duly summoned and an opportunity given him of being fully heard, he can have no reasonable ground of complaint on that account.
The plaintiff’s fifth objection, which refers distinctly to the alleged failure of the committee to give him an opportunity to confront and cross-examine the witnesses who testified against him, has been already sufficiently considered under the previous head.
His sixth objection is that individual members of the governing committee and that the committee as a whole were prejudiced and biased against him, and that for such reason the resolution of expulsion should be set aside.
A careful consideration of the evidence fails to satisfy me that this objection is well founded.
I do not think that the judgment of Mr. King or any other member of the committee was improperly affected by prejudice or bias. Of the subject of the investigation, it could not be but that members of the committee were informed by discussions in the club, and through the circulars distributed by Turnbull. But plaintiff had circulated his own letter of the 7th May, addressed to Turnbull, and it was included in the publication of the latter, together with the letters of Willing and Kimball. But the governing committee of social clubs are not excluded from serving because they have become familiar with the subject matter to be investigated, through conversations with members of the club and otherwise. If this were so, no "competent committee could be found.
*39 I cannot discern that the committee was so constituted as that the plaintiff could not get an honest and fair decision. All the facts were within an exceedingly small circle, and bore upon the subject of conduct. Mr. Townsend’s relationship to Turnbull’s wife, it is said, of itself raises a presumption of bias. But his actual relations with Turnbull were not intimate. And even his disqualification could not invalidate the whole proceeding for the reasons above given.
This matter of bias was considered in Lambert v. Addison, 46 L. T. R. 20, the latest of the English club cases, decided in 1882. In that case the misconduct of a member, which led to .his expulsion, consisted of remarks which he had made in the club, concerning the committee. He had said of it that it is a ££ pocket borough,” keeping to itself the selection of its members, and attending the polls of the club, as they saw-fit, and that it had elected Lieutenant Gould a member in violation of its rules, and that, he was not legally a member of the committee. One of the objections raised by the plaintiff on the trial, was, that the members of the committee, or some of them, had been actuated by malice or bias in voting the resolution. And yet the fact that the committee, which had been so arraigned by the plaintiff, expelled him for charges made against himself, and that Lieut. Gould, without whose vote the resolution could not have been carried, voted in favor of its passage, was considered no ground for setting aside the expulsion. Lord Kay, in delivering the judgment of the court, said: 66 The plaintiff is one of the members of the club, who have committed, by their rules to which he must be taken to have completely assented, to the committee the question of determining whether or not a man should remain a member of the club. Having committed that to the committee, he cannot say the committee are not a proper party to decide it.”
*40 By the objection we are now considering, the honesty of the committee as a whole is assailed. An accusation so serious should not be lightly made. A judgment, the outcome of bias, is not just, and a decision not formed upon, or justified by facts, or which has been reached by distorting or misjudging them, through prejudice, is shocking to conscience and common sense. This arraignment, of the whole committee touches the club itsel , which was, through the circulars and otherwise possessed of the whole case. Is it in accord with our idea of that inate sense of justice which moves men ordinarily, that the large membership of the club would have remained inactive when a fellow member was attempted to be expelled through such unworthy influences? Otherwise does it- not agree with the instim t of men to protest against such a wrong, and to invoke a remedy ?
But, if there was any such injustice, was there any way in which the club itself could have arrested the action of its committee? Fifty members, under the constitution and rules, could have insisted upon a call of a special meeting of the club, to consider a “ special subject.” And could any subject have been of more importance than to right such a wrong against a member ? The assembled club might not have been able, under the constituiion, to rescind the resolution. But they could have condemned it, and have insis ed upon a reconsideration by the committee. But it may be said that there is a presumption “ that all the members of the club would support the committee.” Such presumption cannot obtain, when an expulsion was reached through the bias and prejudice of the whole committee.
In Dawkins v. Antrobus {above), where the committee was charged with “ bias against the plaintiff,” to the suggestion made upon the trial, that the presumption was that the club would support the com *41 mittee, Colton, L. J. (page 637), said : “ I cannot accede to the suggestion in a matter like this, that members of a club, or any body of gentlemen, will support their committee at the expense of truth and honesty when they have a matter like this before them. J. am satisfied, from my own experience, that they will consider the matter fairly, and will not adhere, without regard to justice, to the conclusions, at which the committee may have previously arrived.”
The acquiescence of the club, in itself, however, affords no reason for an approval of the proceeding, or the a- ceptance of the result by the court. Hor is the p'aintiff to suffer disadvantage because his fellow-members did not call a special meeting. He was not bound to ask for such a meeting. This particular subject bears only upon the question of bias and pre.udice, which, if it in fact existed, and affected the whole committee, as is alleged, would have been'perceived by at least a number of members sufficient to put the club in motion, whose moral sense would have found expression in a rebuke, and condemnation of the proceeding.
I discern nothing, in the conduct of this delicate and responsible inquiry to lead me to question the good faith of the committee, or its fairness in meeting a duty cast upon them under the constitution of the club.
Before closing the examination of the case, I must notice a point raised by the learned counsel for the defendant, near the close of their brief, founded upon rule tenth of the club. It is in these words : “In no case, when a resolution has been passed, at a meeting of the committee, affecting the relations of a member of the club toward the club, shall such resolution be reviewed, acted upon or rescinded at a subsequent meeting without a notice in writing, being sent by the secretary to each member of the committee, at least *42 ten days before the meeting, that such previous action will be brought up for review or reconsideration.”
A fair construction of that rule would have enabled the plaintiff to petition the governing committee to reconsider the resolution of expulsion, before coming to a court of equity for relief. When a rule says that a resolution shall not be reviewed or reconsidered except upon certain conditions, there is a power necessarily given to review and reconsider, when the conditions have been complied with. The plaintiff has made no application to the committee for a review or reconsideration of the resolution of his expulsion.
If it was proper in any view that plaintiff should have another opportunity to meet anything alleged against him, which he might suppose had not been sufficiently considered, or if he had believed that through some omission on his part or that of the committee, some injustice had been done him, and that tipon a review the judgment of the committee might be modified, why did he not call the attention of the committee to it by petition or otherwise, and ask for a reconsideration ? I cannot think that the committee were influenced by any motive other than a purpose to do justice. They may have granted a review or they may have refused ; the presumption is that they would have done wbat was right and just.
The principles of natural justice do not rest exclusively in the breast of the judge ; they are appreciated by and affect men generally. And one would suppose that an application of the plaintiff for a review would have been entirely safe in the hands of his fellow members who composed this committee. And as there was a way open to the plaintiff, by. the rules of the club, at least, to ask for a review, which the committee had the power to grant, prudence would seem to suggest that such course should have been taken. In La Fond v. Deems, 81 N. Y. 508, Miller, J., in con *43 sidering such subject, says: “Courts should not, as a general rule, interfere with the contentions and quarrels of voluntary associations so long as the government is honestly and fairly administered, and those who have grievances, should be required in the first instance to resort to the remedies for redress, provided by the rules and regulations.”
This rule was applied in White v. Brownell, 2 Daly, 327, per Daly, J. I am satisfied that such rule is reasonable in itself, and should ,be adhered to by the courts, for if their doors are to be thrown open wide to all cases in which the proceedings and practice of voluntary associations in the expulsion of members shall be revised, notwithstanding provision is made for a review, or a rehearing, within these bodies by their rules, the courts will in the end be flooded with cases of this character, for the number of such associations organized for various purposes, already large, is constantly inreasing. And yet, as has been seen by the previous discussion, the decision in this case is not placed exclusively upon such ground, although it is not overlooked.
In view of the elaborate discussion of the various questions, involved in this case by the counsel, and their importance, I considered it my duty to carefully consider the whole case upon its merits, and to scrutinize the proceedings of the committee, in the light of all the facts developed on the trial. Practically, the proper disposition if the objections taken by plaintiff has involved a review of the whole action of the club toward him. For, until I considered what was actually done, I could not well say, whether or not, any step, which justice demanded, had been taken: And this method has resulted in an opinion of much greater length than I had originally intended.
I have endeavored to give the plaintiff’s whole case j a patient consideration, so as to ascertain whether the *44 governors of the club had acted fairly and in good faith toward him, and whether or not they had withheld from him any notice or right contrary to justice, or through which his case might have had a better solution. But I do not find, in a review of the whole proceeding, that any right or privilege, which natural justice confers, was denied to or withheld from him, or that there is anything in the case to impugn the fairness or good faith of the committee. Nor has my attention been called to any specific fact, omitted to be brought to the notice of the committee from any cause, which would have changed the complexion of the case or made it more favorable to the plaintiff. Had it been, the result might have been otherwise, but as it is, the plaintiff’s complaint must be dismissed, with costs.
Note on Judicial Interposition in Affairs op a Voluntary Association.
The general principle that courts of chancery have supervision and control of all unincorporated societies or associations ; and with respect to them they have the power of prevention of acts contrary to law and prejudicial to the interests of the community, orto the rights of individuals, and can afford specific relief where a recovery in damages would be an inadequate remedy for the wrong ; and that thus, where by reason of the numbers of the. parties and the character of their rights, damages are unsuitable as a means of redress, equity will apply the required remedy, was recently asserted in Ebbinghaus v. Killian (Supm. Ct. Dist. of Columbia Feb. 1881), 9 Washington L. Rep. 627, a case of a controversy over a trust claimed to have been created for religious purposes.
Courts will not inquire into the merits. ] But the rule laid down in the principal ease, in the text above, is well settled that the courts will not review the merits of tile expulsion of a member of a voluntary association if its rules have been complied with, and provided the excluded member has had due notice and ah opportunity of being fully and fairly heard, and no principle of natural justice has been violated. White v. Brownel, 14 Abb. Pr. N. S. 162; S. C., 2 Daly, 329 (citing Commonwealth v. Pike Beneficial Society, 8 W. & S. [Pa.] *45 250); Olery v. Brown, 51 How. Pr. 92, 96 ; Lafond v. Deems, 8 Abb. N. C. 888; S. C., 81 N. Y. 507, 514; Hutchinson v. Lawrence, 67 How. Pr. 38, 42 ; Hopkinson v. Marquis of Exeter, L. R. 5 Eq. 63 ; Gardner v. Freemantle, 19 W. R. 256 ; Lyttleton v. Blackburn, 45 L. J. N. S. 219; S. C., 38 L. T. R. N. S. 642; Dawkins v. Autrobus, L. R. 17 Ch. Div. 615 ; S. C., 41 Law Times R. N. S. 490 ; aff'd in Ct. of App. 44 Law Times R. N. S. 557; Lambert v. Addison, 46 Law Times R. N. S. 20.
Proceedings to expel a member of a voluntary association in conformity with its articles of association, are to be considered without too much regard to any technicalities. Substantial justice is to be followed rather than form. People ®. St. George’s Society of Detroit, 28 Hieh. 261.
Rules of the association to be strictly followed.] But that such an association is bound by the exact letter of its rules, especially when seeking to expel a member for a supposed violation thereof, is well illustrated by the English case of Foster v. Harrison, of which the following account is given in the Law Times of Jan. 14th 1882, 72 Law Times, 183:
“On the 19th Feb. last we offered some observations on the subject of expulsion from clubs, and came to the conclusion that, while clubs or committees claiming to exercise the right of expulsion were irresponsible to the law, and their decisions were irreversible by it, so long as the club or committee had acted in the bona fide exercise of its authority, the greatest care must be taken by the acting body to act in all particulars, even the most minute, with bona fides, in exact accordance with the rules, and to give a fair opportunity of defending himself, to the member whom it was proposed to expel. The result of a motion made before Vice-Chancellor Bacon, on the 9th inst., in the case of Foster v. Harrison, the final issue of which case was in fact decided by the result of the motion, goes far to support the propositions for which we contended. The club where the dispute arose was a workingmen’s club at the West End, and the plaintiff was a member of the club, and also a member of a Licensed Victuallers’ Trade Protection Association. The circumstances under which the plaintiff was expelled by the club committee were as follows : The committee of the club, who held no license for the sale of spirituous liquors, were accustomed to sell spirits and beer in bottle to members, to be either consumed on the premises or taken away. The plaintiff, to test the legality of this course, and by the instructions of his Trade Protection Association, bought a bottle of whisky and another of beer at the club and took them away with him. He then sent a messenger with his member’s ticket, with instructions *46 to buy a bottle of beer, but he was not served, on its being discovered that he was not a member. The Trade Protection Association took out a summons in the police court against the committee for an infringement of the licensing laws ; evidence was given by the plaintiff in support, and the co'mmittee were held guilty and fined. The plaintiff was then informed that his conduct would be considered by the committee, and they afterwards informed him that he had been expelled for breach of the club rules. The only rule which was cited on the hearing of the motion as having been infringed was a rule providing that no visitor could pay for any article, and the contention on the part of the club was, that the attempt of the plaintiff to purchase through the messenger was a breach of the rule with respect to visitors. The motion made on behalf of the plaintiff was for an injunction to restrain the committee from interfering with his enjoyment of the club property, and the Vice-Chancellor granted the application, holding that no breach of the rules had been committed, that every member of a club was entitled to enjoy the advantages of the club unless guilty of conduct unfitting him to remain a member, and that the committee had acted without reasonable excuse or justification. The consequences of expulsion from clubs may be very serious ; in any case it involves the deprivation of rights and privileges" which the expelled member has purchased, and it is a fitting exercise of the authority of the court to prevent such deprivation when undeserved. The rules of this club seem to have been much less stringent than club rules usually are, and to have given the committee far less of an autocracy than commmittees generally expect. This must in all probability have been intentional, and if other clubs would follow the example some good might be done. As it is, the rules generally give such extensive powers that a member is helpless when he has the committee against him, if there is the slightest pretence for their conduct, for an appeal to the club generally is idle, as to reverse the decision of the committee would be to condemn them.”
See also Labouchere v. Earl of Wharncliffe, L. R. 13 Ch. Div. 346 for an instance showing how strictly the rules of such an association must be followed in the matter of giving to a member due notice of a meeting called to consider his expulsion; for in that case, under a rule requiring a fortnight’s notice to be given, it was held that a notice posted at 3 A. M. on the 1st of the month for a meeting to be held on the 14th was insufficient, and that .the member did not waive his rights by being present at the meeting to defend upon the merits.
Remedies within the association to be first exhausted.] That redress *47 must first be sought within tire association, if possible, before the excluded member can resort to the courts, see White v. Brownell, 4 Abb. Pr. N. S. 102; S. C., 2 Daly, 329; Lafond v. Deems, 8 Abb. N. C. 388; S. C., 81 N. Y. 508; Poultney v. Bachman, 31 Hun, 49 (case of a corporation), citing the above cases and Harrington v. Workingmen’s Benev. Association, 27 Alb. L. J. 43.
See also Bauer’s Appeal (Pa.) 18 Alb. L. J. 218.
Reasonableness of by-laws not inquired into.] The members of a voluntary unincorporated society are bound by their duly adopted by-laws and regulations whether they are reasonable or not (Elsas v. Alford, 1 City Ct. R. 123); and the courts can only examine whether they have been hdopted in the way agreed upon by the members of the association, and cannot determine whether they are reasonable or unreasonable. So held in Kehlenbeck v. Logeman, 10 Daly, 447 where the by-laws and constitution of a voluntary association were so worded as to permit three-fourths of the members present to amend them in any respect they might see fit, and there was nothing requiring any notice of such amendment, to be sent to members ; and where the by-laws were so amended as to require every member as soon as he became sick or unable to work to notify the secretary of the association and to deliver to him or the association within three days thereafter a certificate of the attending physician as to the nature of the sickness ; and where the plaintiff had no notice of the amendment and sought to recover certain sick benefits. The court said, per Van Brunt, J., at p. 448:
“It has been held in this court upon more than one occasion that in respect to the by-laws of a voluntary association the court has no visitorial power and cannot determine whether they are reasonable or unreasonable, and the only question which it can examine is whether they have been adopted in the way which has been agreed upon by the members of the association. .... The association being a voluntary one ns has above been stated, this court has no power to pass upon the question as to whether such rules and regulations as they choose to adopt for the guidance of their own affairs are reasonable or unreasonable.”
In the case of a corporation, however, its by-laws must be reasonable, and not oppressive. See Angell & Ames on Corp. § 347 et seq.
See also People v. St. Franciscus Benev. Soc., 24 How. Pr. 216, 221 for a dictum by Marvin, J. to the effect that a by-law of a corporation would be unreasonable and illegal which provided for the expulsion of a member without notice, but that in the case of a voluntary unincorporated association, in which the associates make all their own *48 laws, they may provide for expulsion without- notice if they choose to do so. Compare Fritz v. Muck, 62 How. Pr. 69, where the court granted equitable relief restoring to membership one who had been, expelled without notice from an unincorporated association [the statement in the first lines of the opinion that it was incorporated is a misprint] whose by-laws contained no provision as to giving notice and in that regard were pronounced unreasonable by the court. But this case can hardly be regarded ns holding that the court would give relief in case there had been an express provision in the by-laws for expulsion without notice, although such a provision might be deemed unreasonable, but the case would seem only to hold that it is contrary to natural justice to expel a member without notice, in the absence of any provision as to notice.
To what extent an arbitration- clause in the constitution of an unincorporated association is binding upon the members thereof, see Heath v. New York Gold Exchange, 7 Abb. Pr. N. S. 251; S. C.. 38 How. Pr. 168, which distinguishes White v. Brownell 4 Abb. Pr. N. S. 162; S. C., 2 Daly, 329), and holds that such a clause has only the same effect as a private agreement to submit any controversy to arbitrators, and as such agreements, on grounds of public policy, could not be enforced, the court would not continue the temporary injunction to restrain defendants from arbitrating plaintiff’s case, because as their action would not be binding upon the plaintiff, he could not be injured thereby.
Compare Savannah Cotton Exchange v. State, 51 Geo. 668. Section 1 of article 7, of association of the Savannah Cotton Exchange, provided that “any member who shall be accused of willfully violating the constitution and by-laws, or of fraudulent breach of contract, or of any proceeding inconsistent with the just and equitable |H-inciples of trade, or of other misconduct, may, on complaint, be summoned before the full board of directors, and if the charges against him be, in the opinion of the board, substantiated, he may, by a vote of not less than two-thirds of the members of the board, be suspended or expelled from the exchange.” Article 6 provided that all claims of one member against another arising from cotton transactions should be subject to arbitration, specified the manner in1 which it should be had, and established a board of appeals.
Held, 1. That the failure of a member to comply with an award rendered in such an arbitration, against his protest that the exchange had no jurisdiction of the matter in issue, was not such misconduct as would authorize his expulsion under section 1 of article 7.
2. That such member was entitled to an appeal on the question *49 of jurisdiction without submitting the whole merits of the controversy.
3. That if the Cotton Exchange had the authority to act as an arbitration court under its charter, its awards are subject to be reviewed and examined, so far as the legal rights of the parties are concerned, by the judicial tribunals of the State, in the same manner as are the awards of other arbitrators.
Power of expulsion.] In England, in the absence of any provision in the constitution or by-laws of an unincorporated voluntary association, giving power of expulsion, it seems that there is no inherent power to expel a member, since it forms no part of the written contract by which the members are associated together. Dawkins v. Antrobus, L. R. 17 Ch. Div. 615, Per Jessel, M. R., S. C., 41 Law Times R. N. S. 490; aff’d in 44 Law Times R. N. S. 557. But in this country it has been held that such an association can expel a member for the same causes that a corporation can in the absence of any provision therefor in its charter or by-laws—viz : where the member has been convicted of an infamous offense such as perjury, forgery, etc., or where the offense is against his duty as a member, or where the offense is both against his duty as a member and also indictable by the law of the land. Leech v. Harris, 2 Brews. (Pa.) 571. And in White v. Brownell, 4 Abb. Pr. N. S. 162; S. C., 2 Daly 329, it is said by Judge Daly, F. J., that “ where they have no regulation upon the subject, tlu-y may expel a member by a vote of the majority if he has been notified of the charge against him, and afforded an opportunity of being heard in his defense "-—citing Innes v.Wylie, 1 Car. & Kir. 262. And under a provision in the rules of a social club that a “general meeting may alter rules affecting the general interests of the club " it has been held in England that a new rule providing for the expulsion of a member for conduct injurious to the character and interests of the club is binding upon a member expelled thereunder, although there was no provision for expulsion when he became a member ; for he is deemed to have consented or acquiesced in such provisions. Dawkins v. Antrobus (above). For an illustration of the same general principle, see the recent case of Poultney v. Bachman, 31 Hun, 49, where it is held that a Lodge of Odd Fellows had power to alter a by-law fixing the amount to be paid to sick members, even though such alteration is made after a member is taken sick, and reduces the amount to be received by him, since the power of amendment and alteration of the by-laws reserved in the constitution of the lodge formed a part of the contract to which the member assented and by which he was bound when he became a member.
Under a rule providing for expulsion “ in case* the conduct of any *50 member either in or out of the club house ” shall be'injurious to the character and interests of the club, it seems that a member may be expelled for conduct entirely disconnected with the club, although such action of the club might be a circumstance to be considered by tlie court or jury in determining whether the club acted in good faith. Dawkins v. Antrobus, L. R. 17 Ch. Div. 615, 622-624, Per Jessel, M. R.
It seems that an association cannot expel a member because he does not appear to answer charges, and without proof of the charges. People ex rel. Corrigan v. Young Men’s Benev. Soc., 65 Barb. 357, 359.
For the difference between such unincorporated associations and a corporation, as to the power of expulsion, see White v. Brownell, 4 Abb. Pr. N. S. 162, 191-194; S. C., 2 Daly, 329, 357-359.
And for a discussion of the rules applicable in the case of a corporation, see Blumenthal v. Cincinnati Cham. of Com. &c., 7 Weekly Cin. L. Bul. 327 (Cin. Super. Ct. June, 1882), and cases cited.
Notice.] The notice to an accused member of such an association must be given in strict compliance with the provision therefor in its constitution or by-laws (Labouchere v. Earl of Wharncliffe, L. R. 13 Ch. Div. 346; S. C., 41 Law Times R. N. S. 638); and in the absence of any provision for a different mode of service, it seems that notice should be served personally ; or if that can be dispensed with, then, in such other mode as will be most likely to effect its object (Wachtel v. Noah Widows’, &c. Soc., 84 N. Y. 28, 31); and the failure of a member to notify the association of a change of residence, does not excuse the association from giving him notice before expelling him, at least where a small penalty is expressly prescribed for such failure, lb. Neither will an accused member be deemed to have waived his right to notice of the charges against him by attending and entering upon his defense. Downing v. St. Columba’s Society, 10 Daly, 262, 264; Labouchere v. Earl of Wharncliffe {above).
Notice is not sufficiently proved by the testimony of a witness that he served upon the accused member a written notice to appear at a particular time where he also testifies that he cannot say what the notice was, as. he handed it to the accused without reading it to him, and it was written by an officer of the society who is not examined. Downing v. St. Columba’s Soc., 10 Daly, 262.
That notice should be given in the absencejany provision therefor in the by-laws, see Fritz v. Muck, 62 How. Pr. 69; but it seems that no notice need be given where there is an express provision in the by-laws for expulsion without notice. People v. St. Franciscus Benev. Soc., 24 How. Pr. 216, 221.
*51 Form of remedy.] In the case of unincorporated associations, the usual and proper form of remedy of an expelled or suspended member seems to be an injunction restraining the officers of the association from interfering -with his enjoyment of its privileges. In England, the •injunction suit is brought against the governing committee of the association. (See cases cited above.) In this State, under a provision of the code, the action is properly brought against the president or treasurer of the association. Code Cin. Pro. § 1919 ; Olery v. Brown, 51 How. Pr. 92; Fritz v. Muck, 62 How. Pr. 69; and where an. association lacks both of those officers, the suit may be brought against its chief officer. See Hathaway v. Am. Mining Exchange, 31 Hun, 575.
But where a member of a corporation has been wrongfully expelled, the proper remedy is by mandamus against the corporation to compel it to restore him to membership. Angell & Ames on Corp. § 704 ; People v. Benevolent Society, 3 Hun, 361, citing People v. St. Franciscus Benev. Soc., 24 How. Pr. 216, and People v. Erie Co. Med. Soc., 32 N. Y. 187. Compare Blumenthal v. Cincinnati Cham. of Com., 7 Weekly Cin. L. Bul. 327 and cases cited.
That excluding a member from privileges of membership in a voluntary association or one elected trustee from the exercise of his office, may be ground for decreeing a dissolution, see Gorham v. Russell, 14 Cal. 531; 18 Cal. 688.
Pleading and evidence.] The legal effect of a by-law may be set out in a pleading without reciting its exact language, and under such a pleading the by-law itself may be put in evidence. Kehlenbeck v. Logeman, 10 Daly, 447, 448.
In Gardner v. Freemantle, 19 W. R. 256, where the governing committee of the club were held to have acted in good faith, five of the eighteen committee were allowed to testify that they acted bona fide and were not influenced by the other party to the controversy who always retired from the committee meeting when the plaintiff’s case was dismissed.
And in Lyttleton v. Blackburn, 33 L. T. R. N. S. 642, the court said it could not take the plaintiff’s assertion that in his belief or in his suspicion the committee acted capriciously in expelling him, in view of the fact that the committee when called upon to do so, swore that they had not exercised their power capriciously, unjustly, maliciously or corruptly, and gave their reasons. ,
Compare on this subject of testimony of a party as to his own good faith, 7 Abb. N. Y. Dig. New ed. (1st vol. of Supp.) 860, ¶ 2260-2272, and 6 Abb. N. Y. Dig. New ed. 199, ¶ 205-211 ; 8 Id. 1040, ¶ 92.
*52 The rule that an act shown to have existed may be presumed to continue is applicable to the fact of membership in good standing ; and this being shown by a certificate issued by the association,-—Held, in a proceeding to reinstate after expulsion without notice, to put the burden of proof on the association. Supreme Lodge Knights of Honor v. Johnson (Indiana, 1882), abst. 8 South. Law Rev. N. S. 58.
For a full discussion of the nature and liabilities of voluntary associations in general, see Note in 4 Abb. N. C. 300, where the cases are collected; also see article in 27 Alb. L. J. 326; Lafond v. Deems, 8 Abb. N. C. 344, revg. 1 Id. 318 ; Ash v. Guie {Penn. Jan. 1880, Mar. 1881), 24 Alb. L. J. 83; S. C., 10 Am. L. Rec. 278; 10 Ins. L. J. 807; 12 Reporter, 281; Ferris v. Shaw, 72 Mo. ; abst. S. C., 15 Am. Law Rev. 695.